# EXHIBIT D

# EXHIBIT A

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

In the Matter of the Arbitration between:

Re: 01-14-0001-6896

VIRGINIA SHASHA AND VIVIENNE PERO, CO-TRUSTEES OF THE VIOLET SHUKER SHASHA TRUST, DANIELLE P. BARGER, TRUSTEE OF THE EDELMAN FAMILY DECEDENT'S TRUST, LAURENCE ADLER AND SHIRLEY ADLER, TRUSTEES OF THE ADLER FAMILY TRUST, MYRNA JOY EDELMAN, TRUSTEE OF THE 2006 GILBERT M. EDELMAN *INTER VIVOS* TRUST, EMPIRE STATE LIQUIDITY FUND, LLC, MARY JANE FALES, JUDITH JACOBSON, MELVYN H. HALPER, PHYLLIS J. HALPER, AND WENDY S. TAMIS ("Claimants"),

                    v.

PETER L. MALKIN, ANTHOHY E. MALKIN, THOMAS N. KELTNER, JR., and MALKIN HOLDINGS, LLC ("Respondents and Counterclaim Claimants"),

                    v.

DANIELLE P. BARGER, TRUSTEE OF THE EDELMAN FAMILY DECEDENT'S TRUST ("Counterclaim Respondent").

---

## <u>FINAL AWARD</u>

We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the three Agreements, each dated January 1, 1962, entered into between Lawrence A. Wien, Henry W. Klein, and Peter L. Malkin, respectively – on the one hand – and numerous "Participants," including Claimants or their predecessors in interest, respectively – on the other hand; and having been duly sworn; and having duly heard the proofs and allegations of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, represented by John W. Griggs, Esquire, Griggs & Adler, P.C., Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, represented by José Anibal Bàez, Esquire, The Baez Law Firm, PLLC, and Respondents, represented by Thomas E.I. Dewey, Esquire, David S. Pegno, Esquire, and Jenifer L. Salzberg, Esquire, Dewey Pegno & Kramarsky LLP; **FIND** and **AWARD**, as follows.

Case No. 01-14-0001-6896

# I.    INTRODUCTION.

## A.    Procedural History.

As set forth in their Conformed Statement of Claim and Demand for Arbitration, filed on October 14, 2014, Claimants seek damages arising out of the alleged "fraudulent and coerced conversion of ownership interests in the Empire State Building into a substantively different investment.  The conversion was the final phase of a complex scheme designed to usurp power, revenue, and ultimately the Building itself from the investors in violation of contractual and fiduciary duties backing back over fifty years."  CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 2.

The evidentiary hearing started on May 24, 2016, after almost two years of pre-hearing discovery and motion practice.  The hearing ended more than two years later, on August 7, 2018.  There were thirty-nine hearing days.  The transcript is more than 8,400 pages and there are hundreds of exhibits, totaling thousands of pages.

The following cursory review of just some of our orders reveals the complexity and contentiousness of this almost six-year-long proceeding:

| Date of Order | Movant | Description of Order |
|---|---|---|
| September 2, 2015 | Counterclaim Respondent Richard Edelman. | Staying counterclaim against Counterclaim Respondent Richard Edelman. |
| November 30, 2015 | Claimants. | Granting Claimants' motion to redact portions of an exhibit to Respondents' motion to compel. |
| December 2, 2015 | Respondents. | Granting in part and denying in part Respondents' motion to compel Claimants to produce certain documents. |
| December 7, 2015 | Claimants. | Granting in part and denying in part Claimants' motion to compel Respondents to produce certain documents. |
| December 15, 2015 | Claimants. | Denying Claimants' motion to redact certain names from their production of documents responsive to Respondents' document Request No. 17. |
| December 17, 2015 | Claimants. | Denying Claimants' motion for reconsideration of December 7, 2015 order. |

Case No. 01-14-0001-6896

| Date of Order | Movant | Description of Order |
|---|---|---|
| December 29, 2015 | Counterclaim Respondent Robert A. Machleder. | Granting Counterclaim Respondent Robert A. Machleder's motion to dismiss Respondents' counterclaim. A three-page memorandum was part of the order. |
| | | |
| January 12, 2016 | Claimants. | Denying Claimants' motion for reconsideration of December 15, 2015 order regarding Respondents' document Request No. 17. |
| January 15, 2016 | Counterclaim Respondent Richard Edelman. | Lifting stay of counterclaim against Counterclaim Respondent Richard Edelman and giving the parties an opportunity to supplement their previously submitted papers regarding Richard Edelman's objections to the American Arbitration Association's jurisdiction in this arbitration proceeding. |
| February 11, 2016 | All parties. | Granting Respondents' motion to compel certain documents in the possession, custody or control of Counterclaim Respondent Richard Edelman and/or Steven Edelman; granting Claimants' motion to compel the deposition of Peter L. Malkin to take place on or before March 7, 2016; directing Respondents to serve a notice of deposition that identifies either Richard Edelman or a claimant as the deponent; and quashing Claimants' subpoenas directed to MacKenzie Partners, Inc. and Duff & Phelps LLC. |
| February 25, 2016 | *Sua sponte*. | Scheduling Order No. 10 that, among other things, directed Richard Edelman to comply with the arbitrators' designated motion-submission procedure. |
| March 3, 2016 | Richard Edelman. | Dismissing as moot Richard Edelman's objections to Respondents' notice of deposition. |
| March 6, 2016 | Claimants. | Denying Claimants' motion objecting to February 11, 2016 discovery order that, as set forth in the twenty-page memorandum accompanying the order, was "Claimants' attempt to seek a fourth bite at the apple on the so called whistleblower-complaint issue." MARCH 6, 2016 MEMORANDUM at 6. |
| April 20, 2016 | Respondents. | Granting Respondents' motion to dismiss as time barred the breach of fiduciary duty claims in paragraphs 27 and 34; and denying Respondents' motion to dismiss in all other respects. A thirty-one-page memorandum accompanied the order. |
| April 22, 2016 | Claimant Trustee Howard Edelman. | Denying Claimant and Counterclaim Respondent trustee Howard Edelman's motion to dismiss counterclaim. |
| May 9, 2016 | Respondents. | Allowing Richard Edelman to testify at the hearing in connection with the counterclaim, subject to certain conditions. |

Case No. 01-14-0001-6896

| Date of Order | Movant | Description of Order |
|---|---|---|
| October 6, 2016 | Joint request of counsel and Claimant Howard Gordon. | Directing identification of Claimants' witnesses during the October 2016 hearing days; and providing Claimant Howard Gordon the opportunity to proffer evidence. |
| | | |
| January 23, 2017 | Claimants. | Denying without prejudice Claimants' requested issuance of a *subpoena duces tecum* to Lawrence E. Dennedy; and granting Claimants' requested issuance of *subpoenas duces tecum* to Christopher Gregory and Brian Ginsberg, subject to certain conditions. |
| January 23, 2017 | Claimants. | Granting Claimants' motion to issue *subpoena duces tecum* to Martin B. Cowan, subject to certain modifications in the accompanying document request. |
| February 10, 2017 | Claimants. | Granting Claimants' motion to issue *subpoena duces tecum* to Lawrence E. Dennedy. |
| February 13, 2017 | Claimant Alan Gordon. | Denying Claimant Alan Gordon's motion to withdraw without prejudice; and directing that Gordon's claims be withdrawn, with prejudice, unless Gordon by February 17, 2017 satisfied certain conditions. |
| March 17, 2017 | Claimant Alan Gordon. | Denying Claimant Alan Gordon's motion to withdraw without prejudice; directing that Gordon's claims be withdrawn, with prejudice, unless Gordon by March 31, 2017 satisfied certain conditions; and denying Gordon's motion to file a dispositive motion. |
| March 20, 2017 | Claimant Alan Gordon. | Denying Claimant Alan Gordon's motion for reconsideration of March 17, 2017 order. |
| March 21, 2017 | Claimant Alan Gordon. | Denying Claimant Alan Gordon's motion for reconsideration of March 17, 2017 order unless Gordon satisfied certain specified conditions; and denying Gordon's request to file a dispositive motion. |
| March 24, 2017 | Claimants. | Denying Claimants' motion to issue a *subpoena duces tecum* to Lawrence E. Dennedy, upon condition that Respondents make a certain unconditional express representation. |
| March 31, 2017 | Claimants. | Denying Claimants' motion to strike Respondents' Timeline. |
| May 3, 2017 | Claimant Alan Gordon. | Dismissing Claimant Alan Gordon's claims with prejudice. |
| May 4, 2017 | Claimants. | Denying Claimants' request to supplement the list of the ballots (or the ballots themselves) that Claimants use or otherwise refer to in questioning witnesses. |
| May 25, 2017 | Claimants. | Granting in part and denying in part Claimants' motion regarding certain hearing procedures, including confirming witness list for the June 5, 2017 to June 9, 2017 hearing days; directing Respondents to identify the |

Case No. 01-14-0001-6896

| Date of Order | Movant | Description of Order |
|---|---|---|
| | | names and schedule of the witnesses who will testify on June 12, 14, 15 and 16, 2017; denying Claimants' request for additional document production; denying Claimants' request that nonparties Steven Edelman and Richard Edelman be allowed to hear the evidence against them; allowing Steven Edelman and Richard Edelman to testify in defense of the counterclaim; and directing procedures for the testimony of Howard Edelman, Lawrence E. Dennedy, and Hal Young. |
| November 17, 2017 | Claimants. | Denying Claimants' motion to dismiss defamation counterclaim and to amend their statement of claim by adding a claim for abuse of process; and confirming that Claimants' claims do not include any claim for damages arising from certain allocations of the value of the subject properties. |
| | | |
| May 29, 2018 | Claimants. | Granting Claimants' motion to substitute successor trustees. |
| July 12, 2018 | Claimants. | Granting Claimants' motion to substitute Danielle P. Barger as the Trustee of the Edelman Family Trust. |
| November 15, 2018 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Granting motion of Griggs & Adler, P.C. to withdraw as counsel for Edelman Family Decedent's Trust; directing a response to the request for a caption change; denying motion of Griggs & Adler, P.C. for certain changes in the post-hearing briefs and briefing schedule; and modifying the post-hearing briefing schedule. |
| December 13, 2018 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Granting motion of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, to amend the caption and modify the post-hearing briefing schedule; and denying motion of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, seeking recusal of one arbitrator, updating of disclosures of two arbitrators, reaffirmation of oaths of two arbitrators, administration of the post-hearing phase by the American Arbitration Association Commercial Division, an accounting of all arbitrator fees and costs associated with certain counterclaims and the withdrawal of Griggs & Adler, P.C., and relief regarding a certain meeting that had been scheduled for August 7, 2018. |
| December 20, 2018 | Claimant Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Directing payment of AAA fees and arbitrator fees in a designated proportion and denying motion of Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, for post-hearing brief-content guidance. |

Case No. 01-14-0001-6896

| Date of Order | Movant | Description of Order |
|---|---|---|
| | | |
| January 7, 2019 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Granting motion of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, to amend the case caption; and denying all objections of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, to December 13, 2018 order. |
| January 11, 2019 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Granting motion of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, to modify the post-hearing briefing schedule; and denying all other requests in the January 8, 2019 Objections of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. |
| February 11, 2019 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Setting forth the allocation of fees of the arbitrators and American Arbitration Association; instructing José Anibal Bàez, Esquire to provide John W. Griggs, Esquire, Griggs & Adler, P.C. with a specification of the "case documents" that Bàez sought from Griggs and has not yet received; and denying all other aspects of the January 15, 2019 response of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, to the January 7 and January 11, 2019 orders. |
| March 14, 2019 | Claimant Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Denying motion of Claimant Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, for reconsideration of allocation of fees in February 11, 2019 Order. |
| March 28, 2019 | Claimant Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Granting motion of Claimant Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, to direct Griggs & Adler, P.C. to provide José Anibal Bàez, Esquire with copies of deposition transcripts, hearing transcripts, and hearing exhibits that Bàez did not yet receive. |
| March 28, 2019 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Granting motion of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, to modify the post-hearing briefing schedule. |
| March 28, 2019 | Claimant Judith Jacobson. | Dismissing Claimant Judith Jacobson's claims, with prejudice, unless Jacobson by April 22, 2019 unconditionally retracted her March 12, 2019 notice to withdraw. |

Case No. 01-14-0001-6896

| Date of Order | Movant | Description of Order |
|---|---|---|
| April 2, 2019 | *Sua sponte.* | Clarifying whether there will be closing arguments or an additional set of post-hearing briefs. |
| April 9, 2019 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Denying motion of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, as set forth in the requests and demands in the April 8, 2019 letter from Griggs & Adler, P.C. that objected to certain aspects of the April 8, 2019 scheduling order. |
| June 13, 2019 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Granting motion of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, to modify the post-hearing briefing schedule; and denying all other merits-based requests and demands in the May 21, 2019 and June 10, 2019 letters from Griggs & Adler, P.C. |
| June 25, 2019 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Granting motion of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, to modify the post-hearing briefing schedule; and denying all other merits-based requests and demands in the May 21, 2019 and June 10, 2019 letters from Griggs & Adler, P.C. |
| July 18, 2019 | Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust. | Granting motion of Claimants other than Danielle P. Barger, Trustee of the Edelman Family Decedent's Trust, for a six-month delay in the briefing schedule. |
| December 10, 2019 | *Sua sponte.* | Directing full payment of outstanding invoices. |
|  |  |  |
| January 13, 2020 | *Sua sponte.* | Modifying the post-hearing briefing schedule. |

### B.   The Remaining Claimants.

As confirmed in the June 2, 2020 e-mail from Jenifer L. Salzberg, Esquire, of Dewey Pegno & Kramarsky LLP, counsel for Respondents, the parties have agreed that the following are the remaining Claimants:

- 2006 Gilbert M. Edelman *Inter Vivos* Trust (Myrna Joy Edelman, Trustee).

- Adler Family Trust (Laurence and Shirley Adler, Trustees).

Case No. 01-14-0001-6896

- Edelman Family Decedent's Trust.[1]

- Violet Shuker Shasha Living Trust (Violet Shasha and Vivienne Pero, Co-Trustees.[2]

- Empire State Liquidity Fund LLC.

- Mary Jane Fales.

- Melvyn H. Halper.

- Phyllis J. Halper.

- Wendy S. Tamis.

The same June 2, 2020 e-mail confirmed that the parties agree that the following are no longer parties to this arbitration proceeding:

- Alan D. Gordon.[3]

---

[1]     By order dated May 11, 2018, Robert Paul Edelman, as the Trustee of the Edelman Family Trust, was substituted, without opposition, for Howard Edelman as the Trustee of the Edelman Family Trust.  Shasha v. Malkin, No. 1:14-cv-09989-AT-RWL (S.D.N.Y. May 11, 2018).  By order dated July 12, 2018, we directed that "Danielle P. Barger as the Trustee of the Edelman Family Trust is substituted for Robert Paul Edelman as Trustee of the Edelman Family Trust."

[2]     By order dated May 11, 2018, Virginia Shasha and Vivienne Pero, as Co-Trustees of the Violet Shuker Shasha Trust, were substituted for Emil Shasha as the Trustee of the Violet Shuker Shasha Trust.  Shasha v. Malkin, No. 1:14-cv-09989-AT-RWL (S.D.N.Y. May 11, 2018).

[3]     By "corrected order" dated March 21, 2017, Gordon's claims were voluntarily dismissed with prejudice:

Gordon's claims are hereby **DISMISSED WITH PREJUDICE**, unless by March 31, 2017:

(a)     Gordon in writing informs the American Arbitration Association ("AAA"), counsel for all other parties, and all arbitrators, that Gordon unconditionally retracts his January 13, 2017 request to withdraw without prejudice from these proceedings;

(b)     Gordon pays to Claimants' counsel all of Gordon's allocated costs through September 12, 2016, as previously invoiced by Claimants' counsel to Gordon in accordance with the cost-allocation arrangements then in effect among all Claimants;

8

- Judith Jacobson.[4]

- Robert A. Machleder.[5]

**C.    Claimants' Claims.**

Claimants' "Conformed Statement of Claim and Demand for Arbitration" set

forth the following claims:

- **First Claim.** Claimants allege that Respondents, in connection with the conversion of ownership interests in the Empire State Building ("ESB"), breached the fiduciary duties they owed to Claimants "through numerous and repeated conflicts of interest, and through actions characterized by self-dealing, disloyalty, unfair dealing, lack of disclosure, lack of due care, misrepresentations, coercion, disregard for Claimants' best interests in fa-

---

(c)    Gordon pays to the AAA (or reimburses Claimants, as the case may be) 0.757805% of 50% (i.e. 0.378903%) of all post-September 12, 2016 costs and expenses of the AAA and the arbitrators that the AAA has invoiced to date; and

(d)    Gordon unconditionally states, in writing, that he hereafter shall expeditiously pay 0.378903% of any and all costs and expenses of the AAA and the arbitrators.

Our May 3, 2017 order stated:

**AND NOW**, this 3rd day of May 2017, upon consideration of the January 13, 2017 letter of claimant Alan Gordon ("Gordon") seeking to "withdraw without prejudice from the instant proceedings," Respondents' February 1, 2017 letter in response to Gordon's January 13, 2017 request, Gordon's February 10, 2017 letter reply, Respondents' March 3, 2017 e-mail, Gordon's March 3, 2017 submission, Claimants' March 3, 2017 e-mail, Claimants' March 14, 2017 e-mail, and Gordon's failure to respond to the Panel's March 21, 2017 Corrected Order, it is hereby **ORDERED** that Gordon's claims hereby are **DISMISSED WITH PREJUDICE**.

[4]    By order dated March 28, 2019, Jacobson's claims were dismissed with prejudice, "unless by April 22, 2019, Jacobson in writing informs the American Arbitration Association, counsel for all other parties, and all arbitrators, that Jacobson unconditionally retracts the Notice to withdraw from these proceedings." Jacobson did not thereafter "unconditionally retract[] the Notice to withdraw from these proceedings."

[5]    On February 23, 2016, Machleder filed a putative "Notice of Forced Dismissal as a Claimant." By memorandum dated March 6, 2016, we concluded, after an exhaustive recitation of the facts and procedural history, that "Mr. Machleder's February 23, 2016 voluntary dismissal of his claims is not 'a forced, default dismissal of a Claimant.'" MARCH 6, 2016 MEMORANDUM at 6-7.

9

Case No. 01-14-0001-6896

vor of their own, and ultimately bad faith." CONFORMED STATEMENT OF
CLAIM AND DEMAND FOR ARBITRATION ¶ 87; see also id. at ¶¶ 88-89.

- **Second Claim.** Claimants allege that Respondents, in connection with the conversion of ownership interests in the ESB, repeatedly breached their contractual obligations to Claimants.

- **Third Claim.** Claimants allege that Respondents, in connection with the conversion of ownership interests in the ESB, engaged in securities fraud by their "numerous and repeated false or misleading statement of material fact about the transaction . . . upon which they intended [Claimants] to rely. ¶Respondents also failed to disclose to [Claimants] material facts that the [Claimants] would have reasonably considered in evaluating the proposed . . . transaction." Id. at ¶ 102.

- **Fourth Claim.** Claimants allege that Respondents, in connection with the conversion of ownership interests in the ESB, engaged in common law fraud through their false and misleading statements of material fact about the transaction and their failures to disclose material facts about the trans-action "upon which [Claimants] would have reasonably relied in evaluat-ing the proposed . . . transaction." Id. at ¶ 111.

**D.    The Objections of Counsel for Claimants Other than Danielle P.
Barger, Trustee of the Edelman Family Decedent's Trust, to the Post-
Hearing Briefing Procedure and Schedule.**

As set forth above, counsel for Claimants other than Danielle P. Barger, Trustee

of the Edelman Family Decedent's Trust – Griggs & Adler, P.C. – lodged repeated objections to

and requests regarding the post-hearing briefing procedure and schedule. See, e.g., MARCH 28,

2019 6:38 PM E-MAIL FROM JOHN W. GRIGGS, ESQUIRE.

In response to these requests, we entered more than ten orders that favorably ad-

dressed Griggs & Adler, P.C.'s requests to delay the post-hearing briefing schedule. See, e.g.,

orders dated August 8, 2018, November 15, 2018, January 11, 2019, March 28, 2019, June 13,

2019, June 25, 2019, July 18, 2019, and January 13, 2020. As a result, the first set of post-

hearing briefs was not filed until February 24, 2020, approximately eighteen months after August

7, 2018, the last hearing day.

Case No. 01-14-0001-6896

We also accommodated Griggs & Adler, P.C.'s concern to have the "last word." To protect a claimed "right of reply," our last order on post-hearing briefing issues, dated January 13, 2020, specifically stated as follows: "Depending on the contents of the post-hearing briefs, the arbitrators in their discretion may schedule (a) closing oral arguments; **or** (b) one additional set of briefs to allow some or all parties to respond in writing to the briefs that are due on April 29, 2020."

We provided for simultaneous post-hearing briefs not only after consulting with the parties, but after expressly and unambiguously confirming that all parties agreed to simultaneous briefing.  See, e.g., T. 8417 (Respondents' counsel stating "yes" to an arbitrator's question, "You both agreed to simultaneous openings?"), 8421 (arbitrator chairperson: "So the issues are, we agree, or rather you agree that there should be simultaneous openings."), 8426 (arbitrator chairperson: "So we agree that the opening, simultaneous openings will be 100 [page limit].") & 8431 (arbitrator chairperson: "So opening simultaneous will be due December 3, 100 pages Times New Roman, 12.0 font, footnotes are 12 points.").

Claimants' claims that simultaneous briefing would cause prejudice or injure Claimants are without merit.  Respondents' initial post-hearing brief spent less than three pages, at the very end, on the defamation counterclaim.  POST-HEARING BRIEF FOR RESPONDENTS-COUNTERCLAIMANTS at 97-100.  By contrast, Counterclaim Respondent's post-hearing brief devoted all allotted twenty pages to argue the factual and legal issues relating to the defamation counterclaim.  EDELMAN FAMILY DECEDENT'S TRUST'S POST-HEARING BRIEF IN OPPOSITION TO RESPONDENTS' DEFAMATION COUNTERCLAIM.  And Counterclaim Respondent, in the second round of post-hearing briefing, took advantage of yet another opportunity to respond to the defamation counterclaim.  EDELMAN FAMILY DECEDENT'S TRUST'S POST-HEARING REPLY BRIEF IN

Case No. 01-14-0001-6896

OPPOSITION TO RESPONDENTS' DEFAMATION COUNTERCLAIM.  Counterclaim Respondent's post-hearing briefs far exceeded the length of Respondents' briefs devoted to the counterclaim, and Counterclaim Respondent got in numerous "last words" on the counterclaim.

Griggs & Adler, P.C. chose not to submit any post-hearing briefs, even though Griggs & Adler, P.C. did not seek leave to withdraw as counsel for its clients.[6]  In the face of this decision not to submit post-hearing briefs, we meticulously and scrupulously have reviewed the record, as set forth below in our detailed discussion and analysis of Claimants' claims and Respondents' counterclaim.

## II.   DISCUSSION.

### A.   The Duff & Phelps Claim.

The "Supervisor," Malkin Holdings LLC, R-231 at 10, hired Duff & Phelps, as "independent valuer," to allocate relative economic values of all entities that would be consolidated into Empire State Realty Trust, Inc. ("ESRT").  R-231 at 164; see also T. 4495, 4498, 4568, 4880, 5627-28, 6143-44, 6221, 6768 & 6951-53.  Duff & Phelps's initial valuation set forth the total exchange value of the entities that would be consolidated into ESRT.  R-231 at 245-46 & C-2-2 to C-2-7; T. 4495; see also CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 49 ("Respondents hired Duff & Phelps to perform the appraisal.  Duff & Phelps derived an exchange value for each property based primarily on a discounted cash flow analysis.  The appraiser added up the total value of all properties and assigned to each an allocation percentage based on its percentage of total value.  The exchange value was then used as the basis to allocate securities issued by the new entity, ESRT, for the properties that were consolidated into the REIT.").

---

[6]       Griggs & Adler, P.C.'s last submission to the panel was a July 9, 2019 e-mail that sought a six-month postponement of the post-hearing briefing process.  We granted this request.

Case No. 01-14-0001-6896

Duff & Phelps's initial valuation allocated 60.3% of the exchange value to the ESB, which represented 34.2% of the total square footage of the consolidated properties.  R-231 at 245-46 & C-2-2 to 2-7; T. 3299 ("The whole building represented about 30 something percent of the area and it was given over 50 percent of the share of the consolidation proceeds.").

Using a discounted cash flow analysis, Duff & Phelps's valuation had an unequal allocation of the exchange values of the three two-tier consolidated properties in the transaction, including the ESB.  The ESB fee owner and lessor (Empire State Building Associates ("ESBA")) was allocated 54.5% and the ESB operating lessee (Empire State Building Company ("ESBC")) was allocated 45.5%.  Id.[7]

The Supervisor disagreed with the 54.5%-45.5% for the ESB split because it was not consistent with the Supervisor's past practice and experience.  T. 2047 ("Things have always been characterized since time began on these different deals as effectively as joint ventures."), 2769-70, 3531 ("[W]hen we received what was referred to as a DCF, the discounted cash flow method, the first cut, we were very surprised at the result because it was different than our kind of real estate business experience instincts told us would be the case.  It was different than the appraisals we had received previously for ESB and for other properties that had a parallel kind of, you know, two-tier synthetic JV structure.  Virtually all of those were very close to 50/50."), 4005-07, 4014-15 & 6768-70; R-231 at 242 ("It would have yielded a sharing ratio substantially dissimilar to that which was provided by other independent valuers in sales over the past decades of other two-tier properties supervised by the [S]upervisor and was approved by investors in both the entities parallel to the subject LLCs and their operating lessees.  .  .  .  In each case, the sale

---

[7]     The sharing ratios under the discounted cash flow analysis were 54.5% for ESBA and 45.5% for ESBC; 48.3% for 60 East 42nd St. Associates L.L.C. and 51.7% for Lincoln Building Associates L.L.C.; and 48.6% for 250 West 57th St. Associates L.L.C. and 51.4% for Fisk Building Associates L.L.C.  R-231 at 242.

Case No. 01-14-0001-6896

included both the lessor and lessee, and the allocation of the purchase price was based on a shar-

ing ratio that was determined based on a report by an independent third party experienced in val-

uing real property and was approved by the investors as part of their consent to the sale.  The

[S]upervisor believes that the preliminary draft value initially provided by the independent third

party (which determined the value of the residual interest in the property after expiration of the

lease on a discounted cash flow basis) was inconsistent with the allocations in these prior sales of

two-tier properties."); see also R-15 at 4 (June 15, 2007) & R-17 at 12 (February 8, 2008).

According to the Supervisor, it always was intended that ESBA, the owner of the

ESB fee interest,[8] and ESBC, the operating lessee of the ESB, would be valued as an economic

joint venture because these two entities always had functioned as an economic joint venture.  For

example:

- The two entities shared net operating profit above a base rent of $1 million
  ("Overage Rent") and a priority return to ESBA.

- The cost of capital improvements was deducted before Overage Rent was
  determined.

- Financing costs were deducted from the overage rent calculation so there
  was a 50/50 sharing of debt service.

- The consent of both entities was required before the ESB could be mort-
  gaged or sold.

R-2 at R_000017774; R-185 at R_00000027-32; R-231 at 238 ("When Lawrence A. Wien, and

subsequently Lawrence A. Wien and Peter L. Malkin, structured the transactions involving the

subject LLCs and the operating lessees, prepared the agreements establishing the structure, and

marketed these investments, the intent of those who created the structure and drafted the agree-

ments related thereto from the beginning was to achieve the economic attributes of a 50/50 joint

---

[8]     ESBA acquired the fee interest in 2002 for $57.5 million.  T. 4045-46.

Case No. 01-14-0001-6896

venture."); R-231 at 238-42 ("Lawrence A. Wien and Peter L. Malkin organized [the ESB] in a two-tier structure for a variety of reasons.  While legally distinct from a joint venture, the structure has the economic attributes of a 50/50 joint venture ("JV").  The entities always functioned economically like a 50/50 JV  .   .   .  ."); T. 2073-77, 4032-33, 4039-40, 4049-50, 4887-93, 5973-81, 6157-61, 6974-75 & 6981-82.  The Helmsley Estate's representatives had the same negative reaction to the proposed 54.5%-45.5% split.  T. 2769-70 & 4006.

Seeking to correct this apparent methodological error, the Supervisor provided additional documents and information to and met with Duff & Phelps.   C-250 at DP_MALKIN_0000021; T. 2770-71, 3532, 4029, 4050, 6157, 6549-50 & 6770.  After thoroughly reviewing the additional information, Duff & Phelps concluded that its initial allocation was not correct and that it instead should use a joint venture "split."  T. 6150, 6157-59, 6162, 6283-85, 6550-53, 6632, 6770, 8257, 8269-70 & 8275; see also R-171 at 13.  Duff & Phelps then modified the allocation to 50.4% for ESBA and 49.6% for ESBC.[9]  R-231 at 265; T. 6966.

In the face of this evidence, Claimants contend the Supervisor breached its fiduciary duties to them by insisting and directing that Duff & Phelps modify the allocation between ESBA and ESBC to an (almost) 50/50 split:

> The Malkins instructed Duff & Phelps to split the value of the ESB on a 50/50 basis between ESBA, the fee and Master Lease owner, and ESBC, the sublessee, even though the appraiser had recommended that ESBA should be allocated a higher percentage.  As the fee owner with perpetual life and a valuable reversionary interest upon expiration of the Sublease, ESBA had greater recognized value than ESBC, which was a limited-life entity that had been improperly extended pursuant to the Sublease modifications.  By insisting on a 50/50 valuation that favored ESBC, thus insuring that ESBC, and most critically, the Helmsley Estate, would be substantially rewarded for approving the Malkins' self-serving project, the Malkins breached their fiduciary duty to the Participants.  The S-4 states that "[t]he independent valuer relied on information the supervisor provided  .

---

[9]      Duff & Phelps allocated 29.9% of the overall exchange value to ESBC and 30.4% of the exchange value to ESBA.  R-231 at C-2-2 to C-2-3.

15

> . . . The supervisor has a conflict of interest in connection with the in-
> formation it provided because it affects the number of shares of common
> stock and operating partnership units issued to it and the Malkin Holdings
> group." This insistence on the 50/50 valuation is further evidence of the
> Malkins' professed self-dealing at the expense of the Participants.

CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 50.

According to Chris Gregory, a managing director in the transaction opinions prac-

tice of Duff & Phelps since 2013, T. 8211, Respondents did not instruct or otherwise pressure

Duff & Phelps to change its methodology:

> Q.  You were told to change to the JV approach by Tom Keltner and Tony
>      Malkin, weren't you?
>
>      .  .  .  .
>
> A.  No, we were not told by them to change our methodology.

T. 8251-52.

We conclude that Claimants have not established that Duff & Phelps, upon being

presented with additional information and facts, improperly changed its valuation methodology

to the joint venture approach, which accorded fully with the Supervisor's decades-long practice

and experience.[10]  Accordingly, Respondents did not breach contractual or fiduciary duties and

obligations or commit securities or common law fraud with respect to the Duff & Phelps alloca-

tion of value between ESBA and ESBC.

### B.     The Override Payment Claims.

The Supervisor solicited "capital transaction overrides" (the "Overrides") in con-

sent solicitation statements sent to Participants, dated September 13, 1991, R-4, September 14,

2001, R-10, and June 9, 2008.  In the event of a "capital transaction," the proposed Consent and

---

[10]     The change from a 54.5%-45.55% split to an (almost) 50%-50% split did not financially
benefit, and in fact adversely affected, the Supervisor, which had a 15% interest in ESBA and only a 6%
interest in ESBC.  T. 2130, 2771-72, 2914-15 & 4061-63.

Case No. 01-14-0001-6896

Authorization form stated that Supervisor would receive ten percent of the distribution of capital proceeds otherwise payable to the consenting Participants, after they received a return of their original investment.  R-4 at R_000008642-43; R-231 at 65 ("Represents a voluntary capital override agreed to by approximately 94% of the participants and documented individually with each participant who granted the override, which provides the [S]upervisor with 10% of the distribution of capital proceeds otherwise payable to [P]articipants that have agreed to the voluntary capital override program after they have received a return of their original investment.").

The September 13, 1991 consent solicitation statement broadly defined a "capital transaction" as follows:

> "Capital Transaction" shall mean any one or more of the following transactions: (i) the original incurrence or refinancing of any indebtedness of [ESBA] or any joint venture in which [ESBA] has an interest, (ii) the sale, exchange, condemnation (or similar eminent domain taking), casualty or other disposition of all or any substantial part of the Property, the Master Lease or [ESBA's] interest in the Property or the Master Lease held through any joint venture in which [ESBA] has an interest, (iii) the liquidation and dissolution of [ESBA] or (iv) any similar transaction or event, the proceeds of·which are deemed attributable to capital in accordance with generally accepted tax or accounting principles.

R-4 at R_000008672; see also T. 4154 ("it's intended to be a broad definition").

The Supervisor requested the voluntary consent of the Participants by asking them to sign a Consent and Authorization form (the "Consent Agreement"), which the Supervisor mailed to the Participants.  R-4 & R-10; see also T. 4152-54.  In seeking authorization, the September 13, 1991 "AUTHORIZATION OF MODIFICATION OF COMPENSATION TO WIEN, MALKIN & BETTEX" ("WM&B")[11] stated, in part, as follows:

> 1.  The undersigned shall pay to WM&B the additional compensation described in Peter L. Malkin's letter of September 13, 1991 and the accompanying Statement.  [ESBA] shall be authorized to effect such

---

[11]      Wien, Malkin & Bettex "supervised the operations of [ESBA] since inception.  The late Lawrence A. Wien and [Peter L. Malkin] organized [ESBA]."  R-4 at R_000008641.

17

payment and compensation arrangements on behalf of WM&B and the undersigned; and

2. Commencing January 1, 1992 through January 5, 2076, WM&B shall pay to the undersigned a portion of certain supervisory fees otherwise payable to WM&B by [ESBA] as set forth in Peter L. Malkin's letter of September 13, 1991 and the accompanying Statement.   Such amount shall be paid to the undersigned no less frequently than annually so long as [ESBA] shall own any interest in the Property and WM&B shall receive such supervisory fees from [ESBA].

R-4 at R_000008646; see also T. 4152.

According to Respondents, 81% of Participants consented to the Overrides in 1991, T. 4152; R-10 at 8532 ("In 1991, more than 81% in interest of the Participants approved a voluntary individual program to share with Wien & Malkin LLP, which has served as [ESBA's] Supervisor from inception, a portion of excess distributions from any capital transaction, without changing the existing compensation to Wien & Malkin.  Approving Participants receive each year a pro rata portion of additional compensation to which Wien & Malkin is otherwise entitled from reductions in master lease rent."); and approximately 94% of Participants consented in total over the course of the three solicitations, R-231 at 65; T. 4152.

In return for signing the Consent Agreement, the Supervisor assigned a *pro rata* portion of the Supervisor's potential incentive compensation due to reductions in rent for the Master Lease, from 1992 to 2076 – an "assignment" worth approximately $50,000 per year if all Participants had executed Authorizations.  R-4 at 8669 ("WM&B will assign, effective January 1, 1992 through January 5, 2076, to the Participant a pro rata portion of WM&B's additional compensation from the scheduled reductions in Master Lease rent to become effective in 1992 and 2013.  Payments will be made by WM&B at least annually.  This assignment will terminate if either [ESBA] no longer has any interest in the Property or WM&B is no longer receiving additional compensation from [ESBA]."); id. at 8673 ("If all Participants execute Authorizations,

Case No. 01-14-0001-6896

WM&B will forego the right to receive $45,017 a year from 1992 to 2013, and $52,405 a year thereafter through January 5, 2076, and Participants will receive such amounts. WM&B will be obligated to assign such sums to each authorizing Participant, even if [ESBA] does not purchase the Property from Prudential."); R-10 at 8548.

According to the Supervisor, the incentive-compensation reductions from 1991 to 2001 totaled $140 for each original $10,000 unit. R-10 at 8532 ("Any Participant whose interest in [ESBA] is not already subject to this voluntary program may now approve the same voluntary program which is in effect for more than 81% of the Participants. An approving Participant will receive now the pro rata payment from Wien & Malkin retroactive to the January 1, 1992 start of this program of approximately $140 for each original $10,000 participating interest.").

All Claimants consented to the Overrides during the 1991 solicitation. See, e.g., R-190 at 14973-76 (Elinor B. Roberts, predecessor to Mary Jane Fales), 14992-94 (Howard S. Edelman and Bernice Edelman), 14995-96 (Gilbert M. Edelman and Myrna Joy Edelman), 15012-16 (Melvyn H. Halper), 15030-32 (Phyllis J. Halper, Trustee, f/b/o Wendy Sue Halper), 15048-49 (Shirley Adler and Laurence Adler, Trustees of the Adler Family Trust, as amended 9/22/93) & 15056-58 (Violet S. Shasha); T. 549-50 & 2165.

The Supervisor considered the REIT IPO a "capital transaction" that triggered the Overrides. Accordingly, the Supervisor received distributions of the Overrides from the REIT IPO proceeds. R-231 at 65 ("The [S]upervisor will receive distributions on the voluntary capital overrides with respect to the consideration from the consolidation, because such consideration constitutes capital proceeds. If the enterprise value determined in connection with the IPO were the same as the aggregate exchange value, such overrides would comprise approximately 9.14% of the economic value of [ESBA]. These voluntary capital overrides were solicited pursuant to

consent solicitation statements dated September 13, 1991, September 14, 2001 and June 9, 2008.").

The publicly filed ESRT Prospectus/Consent Solicitation Statement, dated January 21, 2013 (the "S-4"), disclosed that the exchange value of the relevant REIT IPO override amount applicable to the ESB was $304,352,372.  R-231 at 88; see also CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 52 ("The overrides alone were projected to be worth $304,000,000 to the Malkins, which reduced by that amount the proceeds that the Participants and other investors would have received, and the additional voting rights inflated the Malkins' voting power to more than 30% in ESRT, the newly created entity.").  There is no dispute that the Supervisor in the REIT IPO received payment of the Overrides.

Claimants challenge Respondents' entitlement to receive the Overrides.  Claimants assert (a) the Consent Agreements are invalid and unenforceable for lack of consideration; and (b) the REIT IPO was not a "capital transaction" and, therefore, the Overrides did not apply:

> The Malkins also sought consents to allow gratuitous payments to themselves of 10% of the proceeds from any future "sale or financing" of the ESB, or other similar event, and included these requests in the solicitations of approval for the fee acquisition.  The Malkins referred to these payments as "voluntary overrides."  The voluntary overrides had no connection to the fee acquisition, and the solicitations were complicated and dense.  Even the language of the 1991 and 2001 override solicitations varied, obscuring the scope and voluntary nature of the consents.  Respondents also further confused the Participants by changing the wording and format of the override consent forms in the successive solicitations.  However, the Malkins were persistent in soliciting consents at the expense of the Participants, even despite at least one Claimant's lack of capacity to comprehend what the Malkins were seeking.  Consequently, the solicitations were misleading, and failed to result in a meeting of the minds regarding the parties' respective obligations arising from the application of those obligations to the REIT transaction.

CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 33; see also id. at ¶ 52 ("Forsaking all loyalty to the Participants, the Malkins chose to define the language of the over-

ride solicitations in the most expansive possible terms to encompass the REIT transaction, and thus authorize them to collect the override payments, despite the fact that the override solicitation language justified a narrower, more limited, interpretation that would have excluded the REIT transaction.  However, such an interpretation would have deprived the Malkins of a primary financial benefit of the consolidation, and they chose to violate their duties to the Participants in order to derive that benefit.").

### (1)   Consideration.

Respondents argue that each Participant who entered into a Consent Agreement received valid consideration in exchange for the consent.

*First*, Respondents claim the Supervisor represented that the Participants "would receive (in effect) a deduction in the Supervisor's fees .  .  .  ." RESPONDENTS' POST-HEARING BRIEF at 11.  They contend the Supervisor agreed, in exchange for consenting to the Overrides, to allow each Participant to receive certain compensation the Supervisor was otherwise entitled to receive.  R-4 at R_000008643 & R_000008669.  And they claim that, if every Participant had consented to the Overrides, the Supervisor would have given up fees totaling approximately $45,000 each year from 1992 through 2013, and approximately $50,000 each year thereafter through January 5, 2076, which corresponds to $12 to $15 per $10,000 unit on an annual basis until the REIT IPO.  R-4 at R_000008673; T. 3689 ("It was the portion attributable to the increased profit from reducing debt service, and it was a very small amount.  I think it might have been, you know, $12 a year on a $10,000 investment.") & 4585 ("I think I called them almost nominal.  They're like $15 a year on a $10,000 investment.").

Respondents point out that every Participant who consented to the Overrides received the benefit of the incentive compensation fee reduction.  RESPONDENTS' POST-HEARING

Brief at 55.  They note that the Supervisor gave up the fee reduction with no assurance as to when, if ever, the Overrides might be triggered.  T. 4585 ("That was in 1991 when there was no visible prospect of selling or, you know, of activating this voluntary compensation.  So, you know, it was just $50,000 a year surrender by Malkin Holdings without any assurance that there would ever been a return on that you might say.").  According to Respondents, this constituted adequate and hence valid consideration because, they assert, "courts are not to inquire into the adequacy of consideration."  Caisse Nationale de Credit Agricole-CNCA v. Valcorp, Inc., 28 F.3d 259, 265 (2d Cir. 1994).

*Second*, Respondents argue that the Supervisor's continued provision of supervisory services constituted valid consideration for the Overrides because the services that the Supervisor specifically was required to provide had expanded dramatically due to the decline of services that Helmsley-Spear had provided.  T. 3689 ("The other part of the consideration which was, you know, presented in this context was, the supervisors'[] continuing service in an expanded array of services as, you know, property management became more demanding and various reasons.").

Keltner testified that the alleged fee reduction was the "technical" consideration and that the "real consideration" was providing expanded supervisory services:

> ARBITRATOR SINGER: I just have one follow-up question in part because you're a lawyer.  But what is your understanding of the consideration that was given in exchange for the 10 percent override?
>
> THE WITNESS: There was kind of a technical consideration which was the assignment from the supervisor to the participant of a slight increment in the supervisory fee.  It turned out to be like $12, $15 a year on a $10,000 unit.  I think the real consideration and real operative factors are the ones I mentioned earlier.

Case No. 01-14-0001-6896

T. 7150-51; <u>see also</u> T. 4159 ("THE CHAIRMAN: [M]y question is, what is your understanding of the consideration supporting the override?  [Keltner]: The benefit to the investors of continuing and expanded supervisory services.").

Even if Respondents incurred a legal detriment in return for the Participants' promises to provide the Overrides, there is a fundamental flaw in Respondents' position – all *non-consenting* Participants continued to receive the same supervisory services that the *consenting Participants* received:

> ARBITRATOR SINGER: One other question which is that after you started getting these voluntary compensation agreements up to 94 percent, were the services that were provided to the 6 percent different than what was provided to the 94 percent?
>
> THE WITNESS: No difference.

T. 4167-68.

Respondents argue the S-4 states only that the Supervisor did not *pay* any consideration for the Overrides, but does not specifically state that no consideration of any kind was *provided* by the Supervisor.  RESPONDENTS' POST-HEARING BRIEF at 55-56 n.357; <u>see</u> R-231 at 61 ("The overrides were granted by the participants in either the subject LLCs' organizational documents or in the subsequent, separate voluntary agreements entered into individually, to permit the supervisor to share in benefits resulting from improvements in the property's operating results and value, and the supervisor did not pay any consideration for the overrides.").

This argument is unpersuasive.  The S-4, which Respondents duly filed with the SEC and then distributed to all Participants and countless other prospective investors, should and

presumably would have stated expressly that the Supervisor had provided a benefit in exchange for the Overrides.  Otherwise, the S-4 is substantially misleading.[12]

Accordingly, we conclude that the Supervisor did not provide consideration in exchange for the Overrides that were voluntarily agreed to in the Consent Agreements.

Respondents make two additional arguments, each based on the New York General Obligations Law.  First, they claim past consideration constitutes valid consideration if expressed in writing, citing Section 5-1105 of the New York General Obligations Law, which states:

> A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

N.Y. GENERAL OBLIGATIONS LAW § 5-1105 (McKinney 2016).

Respondents claim they satisfied Section 5-1105 because the solicitations for the Overrides noted the Supervisor's numerous past actions that further justified the Overrides, and that each of the Claimants or their predecessors in interest agreed to the Overrides in a signed writing.  In support of their proposition, Respondents rely on Hoke v. Shanker, 108 App. Div. 2d 1065 (3d Dep't 1985).  RESPONDENTS' POST-HEARING BRIEF at 56.  That case involved a dispute over an affiliation agreement under which plaintiff New York State Public Employees' Federa-

---

[12]     Anthony Malkin repeatedly stood by the accuracy of all statements in the S-4.  T. 2383 ("Whatever it says is what it says."), 2386-87 ("To be honest with you, sir, whatever is in the document is in the document."), 2406 ("Whatever the document says is what the document says."), 2420 ("[W]hatever the document says is what it says.  I don't recall every single thing in this document.  I signed it.  Whatever is in there is in there."), 2544 ("I'm willing to say that whatever this says is what it says."), 2561 ("No, I don't recall, but whatever is there is there."), 2563 ("Whatever it says it says."), 2915 ("Whatever is in there is what it is."), 2916 ("Whatever is cited in the document.  I don't recall these numbers and so whatever is in the documents is what is in the document[s]." ) & 2923-24 ("[B]ut certainly the contents of the S-4 were provided to the SEC and that includes what it includes.").

Case No. 01-14-0001-6896

tion, AFL-CIO, a union representing some 50,000 state employees, was associated with defend-ants American Federation of Teachers, AFL-CIO and Service Employees' International Union, AFL-CIO, and national and international labor organizations.  The Appellate Division rejected, without explanation or analysis, defendants' claim "that certain promises made therein were merely restatements of promises previously made and, as 'past consideration,' cannot constitute present consideration to support the agreement."  Id. at 1066.

       Section 5-1105 is not applicable here; Respondents did not assert, present any ev-idence, or otherwise establish that "past performance" or "executed performance" constituted the consideration for the Overrides.

       *Second*, Respondents argue there was no need for consideration in exchange for the Overrides, citing Section 5-1103 of the New York General Obligations Law, which states:

> An agreement, promise or undertaking to change or modify, or to dis-charge in whole or in part, any contract, obligation, or lease, or any mort-gage or other security interest in personal or real property, shall not be in-valid because of the absence of consideration, provided that the agree-ment, promise or undertaking changing, modifying, or discharging such contract, obligation, lease, mortgage or security interest, shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent.

N.Y. GENERAL OBLIGATIONS LAW § 5-1103 (McKinney 2016).

       Respondents argue that Section 5-1103 is satisfied because the Overrides were memorialized in the Consent Agreements that Claimants and the Supervisor all signed.  See, e.g., R-190 at R_000014952, R_000014984 & R_0000149593.

       In their post-hearing briefs, Respondents rely only on Granite Partners, L.P. v. Bear Stearns & Co., 58 F. Supp. 2d 228 (S.D.N.Y. 1999), in support of their contention that Sec-tion 5-1103 saves the day.  RESPONDENTS' POST-HEARING BRIEF at 57.  There, the court ruled on a Rule 12(b)(6) motion to dismiss a complaint for legal insufficiency.  The court concluded that

"dismissal of this claim would not be appropriate at this time based upon inadequacy of consid-

eration." Granite Partners, L.P. v. Bear Stearns & Co., 58 F. Supp. 2d at 257.  The court stated

that, "[u]nder New York law, a contract unsupported by consideration is generally invalid.  .  .  .

Neither a promise to do that which the promisor is already bound to do, nor the performance of

any existing obligation constitutes valid consideration."  Id. at 252 (citing Tierney v. Capricorn

Invertors, L.P., 189 App. Div. 2d 629, 631 (1st Dep't 1993)).

The court in Granite Partners, L.P. v. Bear Stearns & Co. concluded it was "una-

ble to say that any contracts formed  .   .   .  were necessarily invalid for lack of consideration."

Id. at 253.  In *dicta*, the court suggested that a written agreement that provided for defendant se-

curities brokers to provide month-end "marks" as part of their ongoing relationship with plaintiff

funds "merely effected a modification of preexisting contracts between the Funds and the Bro-

kers" and, therefore, was enforceable because it was in writing.  Id. ("Under New York law, a

written, signed agreement to discharge or modify an existing obligation is not rendered invalid

because of the absence of consideration.") (citing N.Y. GEN. OBLIG. LAW § 5-1103).  However,

the court did not hold that consideration was not required for the contracts at issue to be valid.

Here, by contrast, the agreements establishing the Overrides did not constitute a

"modification" of an ongoing working relationship.  Instead, they were independent agreements

that potentially provided brand new benefits to the Supervisor.

For all these reasons, the Overrides are not enforceable against Claimants.[13]

---

[13]    Claimants allege Respondents were not entitled to Overrides because the REIT IPO was
not a "Capital Transaction" – ESBA sold its ownership interest in the ESB to an affiliated and controlled
entity in a transaction that was anything but arm's length.  CONFORMED STATEMENT OF CLAIM AND DE-
MAND FOR ARBITRATION ¶¶ 52-53.

We conclude that the REIT IPO was a "Capital Transaction," although we acknowledge
that this determination does not change our conclusion that the Overrides were not enforceable for the
reasons stated above.

Case No. 01-14-0001-6896

(2)    **Claimants' Fraud Claims Relating to the Overrides.**

Claimants assert claims relating to the Overrides based on common law fraud and

misrepresentation, and on SEC Rules 10b-5, 17 C.F.R. § 240.10b-5, and 14a-9, 17 C.F.R. §

240.14a-9.  CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶¶ 99-114; see

also CLAIMANTS' SPECIFICATION OF MATERIAL MISSTATEMENTS AND MATERIAL OMISSIONS ¶¶

78-92.

---

The REIT IPO constituted a *sale* of ESBA's ownership interest in the ESB.  The Contri-
bution Agreement stated, "the Operating Partnership intend[ed] to acquire, directly or indirectly, the right,
title and interests (including fee interest, ground leasehold interests and operating leasehold interests, as
applicable) of the Contributing Entities in the Contributed Properties."  R-226 at Recitals ¶ A.  Title to the
ESB and ownership of the ESB Master Lease changed, and the parties paid New York City transfer taxes.
T. 4156.

Claimants nevertheless assert that, even if the REIT IPO constituted a "sale," it was from
the Malkins to the Malkins and, therefore, the Overrides were not triggered.  Respondents disagree.  See
T. 3184 & 4156-57.  So do we.  The interests of the ESBA Participants were exchanged for interests in
ESRT, a newly established public company subject to SEC and NYSE regulatory oversight – and not un-
der the control of the Malkins or their affiliates.  R-231.  ESBA ceased to exist after the REIT IPO.  See
id. at 59 ("the business of each of the subject LLCs [including ESBA] will be liquidated and wound up
promptly following the closing"); T. 4156-57 ("It's a third party and it's a new entity.  It's transferring the
property into a consolidated entity which is publicly held, overseen by an independent board, a whole new
structure of governance.  There's certainly continuing ownership by all the electing prior investors and
that includes the Malkins.  So they have a large economic interest in the new entity.  It's less than 25 per-
cent.  It's not a sale to the Malkins.").

The REIT IPO was a "Capital Transaction" for two additional reasons.  As set forth in the
Contribution Agreement, the REIT IPO constituted an "exchange":

> [ESBA] desires to, and the Operating Partnership desires [ESBA] to, contribute
> to the Operating Partnership, all of [ESBA's] Property Interest, free and clear of
> all Liens  .   .   .   *in exchange for*  .   .   .   limited partnership interests (the "OP
> Units") in the Operating Partnership, shares of Class A Common Stock and/or
> shares of Class B Common Stock  .   .   .   .

R-226 at Recitals ¶ D (emphasis added); see also T. 4156.

Plus, the REIT IPO was a "disposition."  See, e.g., Lubin v. Belco Petroleum Corp., 1978
U.S. Dist. LEXIS 15868 (S.D.N.Y. Aug. 24, 1978) (arm's length transaction between unrelated parties
involving sale of put-option); Doniger v. Rye Psychiatric Hospital Center, Inc., 122 App. Div. 2d 873 (2d
Dep't 1986) (agreement required shareholders attempting a disposition to offer their shares to the other
shareholders; a petition for judicial dissolution of the corporation was a proposed "disposition"); see also
T. 4156 ("[The REIT transaction] can fall under the term 'sale,' the term 'exchange,' the term 'disposi-
tion' or any similar transaction.").

Case No. 01-14-0001-6896

However, neither the S-4 nor Respondents' other statements regarding the Overrides in connection with the REIT IPO transaction (a) contained or involved any fraudulent or deceitful representations; (b) were untrue, false, or misleading with respect to any material fact; or (c) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Nor did Respondents, in connection with the Overrides, employ any device, scheme, or artifice to defraud; or engage in any act, practice, or course of business which operated or would operate as a fraud or deceit upon Claimants or any other person.  Respondents accurately disclosed that (a) they did not pay any consideration to the Participants in exchange for the Consent Agreements; and (b) the REIT IPO was a "capital transaction."  Accordingly, Respondents did not commit securities or common law fraud with respect to the Overrides.

  **(3)**  **Respondents' Statute of Limitations Defense to the Fraud and Misrepresentation Override Claims.**

Respondents assert the Override claims are time barred.  However, the applicable six-year statute of limitations does not bar these breach-of-contract claims because the REIT IPO closed on October 2, 2013 and Claimants timely commenced this arbitration proceeding on October 14, 2014.

  **C.**  **The Lease Extension Claims.**

  **(1)**  **The Master Lease.**

In 1961, ESBA, "a general partnership consisting of Lawrence A. Wien, Henry W. Klein, and Peter L. Malkin," acquired the "Master Lease" to the ESB.  R-2 at ¶ I(A)(1) (ESBA Prospectus) ("Upon completion of the transactions described below [ESBA] will own a net lease  .   .   . of the [ESB], 350 Fifth Avenue, New·York City and the land thereunder.").

Case No. 01-14-0001-6896

As set forth in the ESBA Prospectus, "[t]he initial term [of the Master Lease] will be 30 years and nine days to January 5, 1992.  [ESBA] will have renewal options for four additional 21-year terms.  Renewals are automatic upon the giving of appropriate notice by [ESBA], and do not require the payment of any additional consideration."  Id. at ¶ V(1).  The Master Lease, including renewal privileges, was due to expire on January 5, 2076.  R-4 at R_000008652. The "annual net rent" during the term of the Master Lease was (a) $3,470,560 during the initial 30-year term, (b) $1,970,000 during the first 21-year renewal term and (c) $1,723,750 during each of the three successive 21-year renewal periods.  Id.

**(2)    The Sublease.**

"[ESBC was] a joint venture composed of [Lawrence A.] Wien, Mr. Harry Hclmsley, and two corporations owned by others."  R-2 at ¶ I(A)(5); see also T. 1472.

Under the ESBA-ESBC net sublease – the "Operating Lease" – ESBA as sublessor subleased the ESB premises to ESBC as operating sublessee; the term and renewal privileges of the Master Lease and the Sublease were virtually identical.  R-2 at ¶¶ I(A)(2) & (5) ("[ESBA] has contracted to purchase the [ESB], and the ground lease of the land underlying the building.  . .  . Simultaneously with the purchase, it will execute a net Sublease of the entire premises to [ESBC] (the 'Sublessee'), with the same term and renewal privileges as in the Master Lease."); id. at ¶ VI(1)(a) ("The Sublease will be for the same initial term as the Master Lease, less one day.  It will have coextensive renewal privileges."); T. 2620-22.

To protect the ESBA Participants from liability and unfavorable tax treatment, ESBA's only purpose was to own the Master Lease.  C-19 at ¶ 2 ("The only purpose of the [ESBA] partnership shall be the ownership of the Master Lease."); R-2 at ¶ I(A)(5) ("[ESBA] will not operate the property."); R-3 at ¶ 14 (ESBA Partnership Agreement); R-4 at

Case No. 01-14-0001-6896

R_000008652 ("The Master Lease obligates [ESBA], among other things, to pay all real estate taxes and other impositions, to keep the Property insured against casualty loss, general liability and certain other risks and to keep the Property, including all structural components, in good repair.  The Sublease obligates [ESBC] to satisfy such obligations.  This arrangement insulates the Participants from liabilities associated with operating [the ESB]."); T. 1636, 2603, 2605 ("Therefore, by putting these thousands of investors in as participants, again, not actual partners, in joint ventures, in a joint venture with agents who were then effectively general partners and then having [ESBC] operate the company, another general partner, you gave them the flow-through of income without tax on a corporate level, plus you shielded them from liability.  If they had any involvement at all in the operation of the building, they ran the prospect of risk of joint and several personal liability for anything that would happen at the building."), 2634, 4033, 4036-37, 4173 & 4596.

> As set forth in the ESBA Prospectus, ESBC controlled all operations of the ESB:
>
> > [ESBC] is a joint venture among Lawrence A. Wien (25% interest), Harry B. Helmsley (25%), Cargo Despatch, Inc. (37½%)  .   .   . and Martin Weiner Realty Corporation (12.5%)  .   .   .   . The joint venturers have agreed that Messrs. Wien and Helmsley will control all matters relating to the operation of the building.  Mr. Helmsley's firm, Helmsley-Spear, Inc., will act as managing agents for the building.

R-2 at ¶ VI(2); see also R-4 at R_000008652; R-189 at R_000008923-24 (Consent and Operating Agreement for ESBC) ("Lawrence A. Wien and Harry B. Helmsley, or survivor, and whether or not they or he are then parties hereunder, shall have full administrative and operational control of all matters connected with the business of the partnership other than those matters mentioned in paragraph 9 below, but including, without limitation, all matters: connected with the operation, management, leasing, maintenance, repair and improvement of the Building.  .   .   .")[14]; T.

---

[14]     The referenced paragraph 9 carve out states as follows:

1426 ("All the power, authority and liability for the operation of the [ESB] in every single event, other than what was noted, from the colors of the lights to the types of the uniforms, to you name it, was vested in [ESBC].")., 2077 & 2633-35.

> Under the Sublease, ESBC paid the following to ESBA:
>
> [ESBC] is required to pay annual minimum rent of $6,780,560 through January 4, 1992; $6,018,750 from January 5, 1992 through January 4, 2013; and $5,895,625 from January 5, 2013 through January 4, 2076. [ESBC] has exercised its first renewal option for a lease term expiring on January 4, 2013.
>
> [ESBC] is also obligated to pay to [ESBA] additional rent ("Overage Rent") in an amount equal to 50% of [ESBC's] annual net income, as such term is defined in the Sublease, in excess of $1,000,000.  .  .  .

R-4 at R_000008652-53; see also R-2 at ¶ I(A)(6) ("The Sublessee will agree to pay all expenses of operating and maintaining the property and also to pay·[ESBA] an annual net rent (the 'basic Sublease rent') which, if paid, will enable [ESBA] (a) to pay the Master Lease rent and to make any Leasehold Mortgage payments; (b) to defray administrative costs; and (c) to make monthly cash distributions to each participant equal to $900 per year on each $10,000 Participation."); R-17 at R_000029578 ("The effect of these relationships is that [ESBA] receives basic rent of $6,018,750 (from which it must pay master lease rent) annually while [ESBC] receives the first

---

> Notwithstanding anything contained in this agreement, the following, and only the following, which are deemed to be major decisions of policy and matters affecting the partnership beyond administrative and operational matters shall be had and done only with the written approval of parties owning partnership interests aggregating at least Eighty (80%) Per Cent: (a) the modification, sale, assignment or mortgaging of the Operating Sublease; (b) the modification of any mortgage of the Operating Sublease; (c) the making or modification of any sub-sublease of the entire premises; (d) the termination, except for just cause, of the employment of either of the aforesaid firms; and (e) the changing of the compensation of either of such firms.

R-189 at R_000008924.

Case No. 01-14-0001-6896

$1,000,000 in net income after payment of basic rent.  The net priority to [ESBA] over [ESBC] is therefore $4,048,750."); R-231 (S-4) at 240; <u>see also</u> T. 2073 & 6985.

**(3)**       <u>**The Terms of the Master Lease and the Sublease.**</u>

The Master Lease and the Operating Lease were each broken into automatic re-newal periods of twenty-one years.  R-2 at ¶¶ V(1) & VI(1)(a); C-11 at G&A-007253; <u>see also</u> T. 2618 & 6684-88.  These automatic renewal periods ensured tax benefits through a shorter depre-ciation period for the leasehold acquisition cost and improvements:

> The lease was set up with – it was always considered it was one deal, but as with prior deals, the lease was segmented into sections because each section determined the period of time over which you can take deprecia-tion.  So by having an initial term and a series of terms shorter than the to-tal duration of the master lease, you could depreciate everything from the acquisition over the initial term of the lease and then you have a renewal which would set another period over which you could take depreciation.  So my grandfather, the same way he sought to create flow-through treat-ment for income without taxation at a corporate level and then synthesize the joint venture and then protect people from liability, he further utilized what was available under the tax code to accelerate depreciation.  That was fundamentally, you know, his approach to things was tax efficient in-come from real estate.

T. 2628-29; <u>see also</u> T. 3452 ("Those windows were established at inception to allow accelerated depreciation on leasehold acquisition cost and improvements.  They had no other purpose, no other expectation of how it was – you know these were economically compelled, always under-stood to be a foregone conclusion that they will be exercised."), 3453-54, 4033, 4596-98 & 6685 ("The initial term of 30 years was for the purpose of permitting the [ESBA] participants to write off their investment at 3-and-a-third percent a year for 30 years, which created a tax shelter for a little more than one-third of the initial nine percent return.  And that was the purpose of it and it was always contemplated that the investment would continue for at least the 114 year total term.").

32

Because each party needed the other, ESBC had the right to step in and renew both the Master Lease and the Sublease, even if ESBA failed to do so.  C-11 at G&A-6986-007285 ("Sublessor hereby irrevocably appoints Sublessee its attorney-in-fact, coupled with an interest, to execute and deliver any papers and to take any other action in the name of Sublessor necessary to give such notice of renewal to Lessor or to make such assignment upon the conditions stated herein."); T. 1113, 1551, 1594-95, 2754-55, 3443-44, 3459, 3464, 3476, 3896, 4033 ("[T]he renewal options were unilateral and unconditional rights of the lessee.  Again, as a synthetic JV, there was no logic to breaking it up.  The logic was that these two parties were going to work together as long as they had an interest in the property.  There are so many ways in which that was reflected.  The lessor specifically in its organizational documents said it could not operate the property.  It had to have the lessee in place."), 4040, 4172, 4180, 4182, 4293, 4597-98, 5426 & 6688 ("Under the terms of the lease between ESBA and ESBC, it specifically provides that if for any reason ESBA did not renew the lease, ESBC could force the renewal.").

The 1986 Tax Reform Act eliminated the tax benefit of having twenty-one-year renewal terms in the Sublease.  T. 4596.  Absent an economic rationale – there no longer was a benefit in having twenty-one-year windows – ESBA in 2010, as part of a "cleanup" measure, extended the Master Lease for its remaining renewal terms.  ESBC, in turn, exercised the remaining options to extend the Sublease:

> And it was in that framework that we saw the so-called early renewals in 2010.  They were not early as to the next renewal term, but they were early as to the renewal terms that would have followed, you know, maybe the last 40, 30 or 40 years up to 2076.  We saw those as just a cleanup.  It didn't seem responsible for fiduciary just to leave that all up in the air up in a calendar and send a letter every 15 years.  It was economically compelled for the lessee to do that.  There's no question that the lessee is going to renew the lease otherwise its asset is abandoned and extinguished.  It had an unconditional right to do so.  There is no reset of the rent.  There's nothing.  So it was in that context that we just cleaned this up by doing an

> early renewal of all the lease terms remaining.  We did this at ESB.  We
> did it at other properties, some of which were going into the consolidation
> and others that weren't.  It was just a general approach that we took to all
> these supervised assets.  So in that sense, we really treated this whole,
> quote, early renewal as a nonevent, honestly a nonevent.

T. 4196-97 & 4596-97; <u>see also</u> T. 3454 ("When that purpose had fallen away, there's – the de-

preciation is not governed in that way under current tax laws.  It hasn't been for a few decades.

There was no reason to, for either party, to insist upon this artificial windows [sic] for renewal.")

& 6744 ("the tax reason for having a 30-year term no longer existed and we did a number of

things to sort of clean up and simplify the investment").

### (4)    Claimants' Lease-Extension Allegations.

Claimants challenge Respondents' purported premature exercise of the renewal

options of the Master Lease and the Sublease.  According to Claimants, the Malkins in 2010 uni-

laterally sought "to shift a substantial proportion of the ESB's value from ESBA to ESBC by

adding 63 years to the term of the Sublease, which constituted most, if not all, of the value of

ESBC, thereby securing the Helmsley Estate's support for the REIT, instead of pursuing a trans-

action more favorable to the Participants.  The Master Lease and Sublease both contained four

21-year renewal options, but the renewals could be exercised only at times specified in the re-

spective leases.  In addition, renewal and modification of the Master Lease, as well as modifica-

tion of the Sublease, required approval of the Participants."  CONFORMED STATEMENT OF CLAIM

AND DEMAND FOR ARBITRATION ¶ 41; <u>see also</u> T. 1557 ("Well, we are saying it should not have

been renewed in 2010 when not only the second renewal option was exercised, but also the third

and fourth, and then the restrictions in the lease were, I don't know, waived or something and –

") & 1618; CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶¶ 42-44.

According to Claimants, "[t]he intended effect was to increase the value of ESBC, while simultaneously shifting value away from ESBA. . . ." Id. at ¶ 42; see also T. 1622 ("It artificially inflates ESBC's value.").

In support of these contentions, Claimants rely, in part, on paragraph 4 of the Participation Agreement, which states as follows:

> The Agent shall not agree to sell, mortgage or transfer the Property or the Master Lease, *nor to renew or modify the Master Lease*, nor to make or modify any mortgage thereon, *nor to make or modify any sublease affecting the premises*, nor to convert the partnership to a real estate investment trust, a corporation or any other form of ownership, nor to dispose of any partnership asset in any manner, without the consent of all of the Participants.

C-8 at ¶ 4 (emphasis added); see also T. 199-201, 266, 296-97 & 1545.

**(5)    Claimants did not Prove their Lease Extension Allegations.**

Contrary to Claimants' contention, the Participants did not need to approve the automatic renewal extensions of the Master Lease.  Doing something automatic and exercising a "foregone conclusion," which the parties contemplated at the time of the drafting of the Master Lease, was not a "renewal" or "modification" of the Master Lease.  It was always understood and expected, as a matter of economic necessity, that the Master Lease would be renewed through its 2076 termination date and so there was no need to get the consent of the Participants for the "occasional episodic renewals in order to maintain the master lease in place."  T. 1549, 2621-22, 2754 ("Well, it was as of right.  The agents needed no authorization."), 3452, 3458 ("If you're saying that each time there was a renewal they had to go to the participants and ask permission to make the renewal, that would have rendered the entire structure, you know, inoperative.  It would have defeated everyone's expectations, which is that this is a 115-year lease, at least 115 years."), 4172 ("People considered that this lease ran to 2076, period.  There was so many ways

Case No. 01-14-0001-6896

in which that was not only an expectation but it was a feature of the structure."), 4197 ("It's a

foregone – it's an economically compelled result that these renewals will occur."), 4596, 4900,

5498, 6686-88 & 6745-46.

Past practice confirms this conclusion.  The Master Lease was not only renewed

for another twenty-one-year term in 1989 without seeking participant vote, authorization or ap-

proval; there also was a pointblank statement, in the 1991 ESBA Consent and Authorization

form, that Participant action was *not* required for the renewal.  There is no evidence that any par-

ticipant objected to this renewal procedure.  In fact, there never was a participant vote on an in-

terim extension of a master lease in *any* two-tiered investment that the Malkin parties ever had

supervised.  R-4 at R_000008652 ("[ESBA] has the right to renew the [Master L]ease for four

additional 21-year terms with appropriate notice and without any additional consideration or ac-

tion by the Participants.  In January, 1989, [ESBA] exercised its first 21-year renewal option, for

a term expiring on January 5, 2013."); T. 1554 ("There has never been, in any of these transac-

tions, a consent to the investors to extend a lease and there are many which have such extensions,

provisions in them prior to the IPO."), 3464-69, 4178, 4834-35 & 6715.

Contrary to Claimants' speculative claim that the renewal of the Sublease

"shift[ed] value away from ESBA," CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBI-

TRATION ¶ 42, this "economically-compelled" automatic and "obvious" renewal did not affect

the valuations of ESBA or ESBC, T. 2759 ("Duff assumed the leases were, for both, were re-

newed but for the full term of the original deal."), 4598 ("And when Duff – as I think I've testi-

fied before, when Duff did its valuation, it didn't even ask us if the renewals had been exercised.

It wasn't – it said we know they're going to be exercised if they're economically compelled and

they're unilateral rights of the lessee."), 5425-26, 5431, 6163-64 & 6745-46.  The renewal of the

Case No. 01-14-0001-6896

Sublease to its 2076 terminal position did not have any impact on the relative economic positions of ESBA and ESBC.  T. 1716, 1722-23, 1726 & 4196.

Nor did Claimants support their charge that exercising the renewal options of the Master Lease was part of a covert plan to seek the Helmsley Estate's support for the REIT IPO transaction.  See CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 41.  This contention relies, in part, on the premise that Respondents improperly failed to seek or secure the approval of the Participants for the renewals; but disregards the undisputed facts that Respondents in 1989 did not seek approval for an earlier renewal and that there was no objection to such purported "unilateral" action.

Claimants never explained what would have happened if ESBA had failed to extend the Sublease.  However, ESBC had the right to renew the Sublease and would have renewed the Sublease if ESBA failed to do so.  C-11 at G&A-6986-007283; T. 1551, 1715, 3896, 4033, 4597-98 & 6688.[15]

In fact, the conclusion is inescapable that ESBC – in which the Helmsley Estate had a majority interest, R-2 at ¶ 5 & R-231 at 40-41[16] – would have fought tooth and nail to pro-

---

[15]    If ESBA did not renew the Sublease, ESBA would not have had a sublessee to manage and operate the ESB; ESBA was not authorized to manage or operate the ESB.  C-19 at ¶ 2; R-2 at ¶ I(A)(5); R-3 at ¶ 14; R-4 at R_000008652; T. 2603, 2605, 2634, 4033, 4036-37 & 4596.  So ESBA would have sought to enter into a sublease with another sublessee-operator, T. 4175, which would have lacked ESBC's experience and expertise in operating and managing the ESB.

[16]    The S-4 described the Helmsley Estate's control over ESBC:

The Malkin Family and the Helmsley estate each effectively has an ability to veto actions by [ESBC], because under the operating agreement of [ESBC], full administrative and operational control of all matters connected with the business of [ESBC], including all matters connected with the operation, management, leasing, maintenance, repair and improvement of the [ESB], require the consent of 80% in interest of the participants in [ESBC].  The Helmsley estate (or its successor) owns 63.75% of the participation interests while principals of the supervisor have the right to vote as to 23.75% of the participation interests.

37

tect its lucrative and longstanding interest in the Sublease, *which was worth close to one billion dollars*.  T. 1607, 2761 ("So if we had economically damaged them by failing to renew the operating lease, they would have sued."), 3475-76, 5227-28 (Claimants' expert), 5233 ("I can't think of a reason why [ESBC] wouldn't want to renew those leases economically if it was legally permissible and it was 100 percent up to them without further input."), 5428 ("So the question is what would the ESBC be leaving on the table if they were cut out of its exchange value in the IPO.  And the answer is, $801.7 million of value.  And that would have been cause for concern, to say the least."), 5430 & 6552.

Claimant did not establish how this sudden rupture and resulting conflict would have furthered the economic interests of the Participants.  See T. 5431 ("So from an economic standpoint, because ESBC was a profitable enterprise, it is reasonable to assume that it would have continued to exercise its renewal rights at least through 2076, as it was contractually entitled to do so.  And so therefore there's no reason to believe that they would have done anything other than that.  And so therefore I don't visit [sic] as a value transfer.  I view it as something that would have happened anyway.  And, frankly, from the perspective of the IPO, this gives confidence to the market that ESBA and ESBC are economic partners in the deal for the long term, and that gives comfort to the marketplace and helps facilitate and gives shareholder value in the IPO.").

Just as importantly, Claimants failed to prove that ESBA would have successfully defended its right to remove ESBC, and hence the Helmsley Estate, as the ESB operating sublessee.[17]

---

Id.; see also T. 2293.

[17]    Claimants do not advance the ball by insisting that the Participants had an economic interest in *not* renewing any twenty-one-year terms in the Sublease.  See, e.g., T. 298 ("Well, we wouldn't

Case No. 01-14-0001-6896

For these reasons, we conclude that Respondents, in extending the terms of both the Master Lease and the Sublease through 2076, did not breach contractual or fiduciary duties and obligations or commit securities or common law fraud.

**D.** **Claims Relating to the Increase in the Supervisory Fee.**

Claimants allege Respondents breached their fiduciary duties by improperly and unfairly increasing the supervisory fee that Malkin Holdings charged to ESBA and that Respondents then used this fee increase to increase the capitalized amount Respondents received in the REIT IPO:

> Also in 2010, the Malkins unilaterally increased the supervisory fee charged to ESBA by Malkin Holdings for performing its supervisory functions. Without approval of the Participants, the Malkins increased the fee from $100,000 per year to $725,000, with additional adjustments for inflation in subsequent years. Simultaneously, the Malkins converted payment of the supervisory fee into a priority obligation which took precedence over distributions to the Participants, as well as eliminated any requirement for the Malkins to render services in exchange for collection of the fee. This sevenfold increase in the supervisory fee, along with increases in fees charged by other Malkin-owned entities, was later used in the REIT consolidation to justify payment to the Malkins of $16.3 million to cover "equitized" future value for services that the Malkins never performed.

CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 45; see also id. at ¶ 84 ("Respondents' actions also cost Claimants millions of dollars in lost opportunities to receive greater value from the sale of their units, as well as losses stemming from . . . the skimming of ESBA revenue by Respondents through the unilateral increase of supervisory fees and the capitalization of those fees for services that had not been performed . . . ."); id. at ¶ 88 ("Re-

---

be sharing 50 percent of the net profits. We would have had 100 percent of the net profits. We'd own the property without being encumbered by the lease.") & 864.

This assertion disregards (a) ESBC's unilateral right to renew the Sublease; (b) the Helmsley Estate's interest in ESBC and the Sublease; (c) the fact that the Helmsley Estate would fight to prevent ESBC from being ousted from its lucrative perch as the operating sublessee; and (d) ESBA's need to have an experienced and expert sublessee to manage and operate the ESB – something ESBA indisputably could not do.

Case No. 01-14-0001-6896

spondents have breached their fiduciary duties to Claimants by, among other actions, . . . uni-laterally increasing, prioritizing and equitizing the supervisory fees . . . ."); T. 876 ("Q. So is it your understanding that these substantially increased fees that were actually charged in 2011, were then used in the Duff & Phelps analysis for projecting the discounted – used in the Duff & Phelps analysis for the discounted cash flow valuation of the Malkin company?  A. Yes."), 878 ("It meant that they had chosen to use the higher number to figure out the, what's called the present value of that future income stream that was going to the management company.") & 1811-15; C-29 (July 1, 2010 agreement among members of ESBA) ("Malkin Holdings LLC shall be paid the sum of $725,000 per annum.  Such amount shall be increased annually at the rate of increase in the consumer price index during the prior year . . . .").

The Participation Agreement stated that the Agents needed Participant consent only in certain instances – and determining the Supervisor's compensation was *not* one of those instances.  R-3 at ¶ 4 ("The Agent shall not agree to sell, mortgage or transfer The Property or the Master Lease, nor to renew or modify the Master Lease, nor to make or modify any mortgage thereon, nor to make or modify any sublease affecting the premises, nor to convert the partnership to a real estate investment trust, a corporation or any other form of ownership, nor to dispose of any partnership asset in any manner, without the consent of all of the Participants."); see also T. 3958 ("There was no requirement for participant consent in these matters.  That discretion was given to us.  In fact it was specifically stated that we were to oversee the compensation, it's stated in the participating agreement or the Partnership Agreement that we were to oversee the compensation paid to the [S]upervisor.").

Contrary to Claimants' complaint that the supervisory fee increase was "unilateral" and improper, the ESBA Partnership Agreement specifically authorized the Agents to de-

termine the amount of the Supervisor's compensation.  C-19 at ¶ 5 (ESBA July 11, 1961 partner-

ship agreement among Lawrence A. Wien, Henry W. Klein, and Peter L. Malkin) ("The firm of

Wien, Lane & Klein of 60 East 42nd Street, New York, New York, shall maintain the books and

records of the partnership, shall supervise the operation of this agreement and shall be compen-

sated therefor in an amount to be determined by the partners."); T. 1116-18.

> Further, there were valid reasons to increase the Supervisor's compensation:

> The fixed annual supervisory fee, which had been set in 1961, had not been changed during the roughly 50-year period and as we absorbed more responsibility as supervisor through the capital improvement program, the transition from Helmsley-Spear as manager and other requirements, we saw that the fixed annual supervisory fee, which I think for, in ESB was 100 and something thousand, really didn't even cover our cost and we decided that's not what was intended.

> .  .  .  . So we decided to simply adjust the original number by the cumulative CPI increases over that time period from 1961 to date in 2010, which yielded a new supervisory fee of 725,000 something.  Something in the $700,000 range.

> We did not try to look back and say, you know, we really should have been paid more in the prior years.  We just said in constant dollars, we are keeping the fee as it was originally set and we'll go forward on that basis.

T. 3957-59; see also T. 227, 1115-16, 2752-53, 4273-74, 5409-10, 6627-28 & 6746-47 ("The

basic fee of $100,000 had been set in 1961.  Not only had there been more than 30 years of infla-

tion, but because of the dysfunction of Helmsley-Spear, we had had to add a whole staff of peo-

ple on our payroll so that we were actually losing a considerable amount of money every year

acting as owner's representative.  So we decided this really wasn't right and that maybe the sim-

plest format would be to adjust the number prospectively only to reflect the impact of the Con-

sumer Price Index on the $100,000.").

> The supervisory fee increase did not materially increase the proceeds that Malkin

Holdings received in the REIT IPO:

41

Case No. 01-14-0001-6896

Q. Can you tell us what impact, if any, the supervisory fee increase had on the allocation of exchange value to Malkin Holdings?

A. Duff & Phelps did value Malkin Holdings as an entity and computed its profitability including this increased fee. Its computation indicated an exchange value of about $5 million total.

The IPO proceeds after the, what I call the IPO discount, were about $3-and-a-half million. Well, that's, you know, less than a tenth of a percent of the enterprise value, so this affected the value of Malkin Holdings as Duff & Phelps computed it, but it was moving the needle in a very tiny way and it was not the reason we did this.

We did it because we recognized we were in effect losing money annually in rendering these services and we thought that should be remedied whatever may happen in the future, whether, you know, it's going to be a freestanding entity or be consolidated, whatever, you know.

.   .   .   .

Q. And the $5.8 million exchange value allocation there, it may be obvious but I want to be clear, that included all the supervisory fees and all the other sources of income that Malkin Holdings received, one of which was the supervisory fees from ESBA, correct?

A. Exactly right, yes.

T. 3962-66; see also T. 3194; R-231 at 157 ("The fees for basic and special supervisory services expected to be received over the ten years ended 2020 were taken into account in determining the exchange value of the management companies.") & 265.

Claimants did not seriously challenge the factual underpinnings for the supervisory fee increase, including that (a) the supervisory fee had not changed since 1961; (b) the Consumer Price Index calculations underlying the increase in the supervisory fee, from $100,000 to $725,000, were accurate; (c) the Supervisor's duties, responsibilities and expenses had substantially increased in the preceding almost-fifty years; or (d) the going-forward increase, from $100,000 to $725,000, was proper, fair and appropriate.

42

For these reasons, we conclude that Respondents, in increasing the supervisory fee, did not breach contractual or fiduciary duties and obligations or commit securities or common law fraud.

E.  **The "Poison Pill" Claims.**

Claimants allege Respondents adopted a "poison pill," thereby breaching their contractual and fiduciary duties and obligations, and committing securities and common law fraud:

> In 2008, Respondents began instituting several prerequisites to implement the consolidation that they were planning.  These preliminary actions included  .  .  .  the adoption of a "poison pill" measure to prevent direct third-party proxy solicitations of Participants' interests.
>
> .  .  .  .
>
> On November 30, 2011, Peter Malkin, Anthony Malkin, and Thomas Keltner, acting in their capacity as the members of ESBA LLC, without informing the Participants and without obtaining Participant consent, unilaterally executed Amendment Number One to the ESBA LLC Agreement ("the Poison Pill Amendment"), which purported to vest in Respondents unfettered authority to approve all actions that previously required the Participants' consent.  The Poison Pill Amendment also purported to impose certain limitations on the transfer of ownership interests, thus restricting the Participants' ability to sell their units.  The Poison Pill Amendment provided that any individual or entity, other than Respondents, acquiring an interest in ESBA greater than 6% would lose the rights both to vote and to receive distributions.  The intended effect was to deter direct proxy solicitations to the Participants, and thus leave Respondents with sole discretion to evaluate and disregard all offers for the ESB or ESBA submitted for their approval.  The Poison Pill Amendment was never communicated directly to the Participants, submitted for Participant approval, or adequately or meaningfully disclosed in the S-4.  Again, Respondents violated their duties to the Participants by breaching the Participation Agreements, failing to disclose material information, consolidating Respondents' power at the Participants' expense, and ultimately usurping the Participants' opportunities to receive and evaluate solicitations for their units.

CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶¶ 38 & 46.

In 2011, the Agents adopted a poison pill in Amendment No. 1 to the Limited Liability Company Agreement of ESBA.  R-30; C-121; T. 2762, 3503 & 3507.  As the Form 8-K, filed on December 5, 2011, explained:

> On November 30, 2011, the members of [ESBA] (the "Company"), a New York limited liability company, executed an amendment to the Company's limited liability company agreement (the "Amendment") to create three new series (series A-1, A-2 and A-3) of a new class of equity membership interests (the "new series") which provide protections similar to those under a shareholder rights plan for a corporation.  Each new series corresponds to a participating group for which a member acts as agent.  In general terms, the Amendment works by imposing a significant penalty upon any person or group that acquires 6% or more of the outstanding participation interests in a participating group.  The Amendment should not interfere with any merger or other business combination approved by the members (other than such person or group).

R-30 at 2.

Respondent Anthony Malkin explained the background and purpose of the poison pill:

> We were told that this – well, first of all, we did it to prevent anyone from being able to block the investors on whose behalf we were working from being able to exercise their vote on the proposals put in front of them, number one.  Number two, we did it because we were told that this was the logical and typical thing that you did in this sort of a situation when you were exposed in the middle of going through consents and a process with the SEC that you protected the opportunity for people to act on the transaction by putting in a poison pill.

T. 2762; see also T. 3508 ("There are no – there's no record of, there's no history of ESBA participants holding anything like a six percent interest.  The amount of the transactions that occurred annually were way below six percent.  The six percent was chosen not to try to restrict the normal course of transfers by the existing participants.  It was chosen based on the kind of corporate metrics that you take about one-third of what would be a blocking position and that's the trigger for a pill."), 6748 ("[W]e were told that it was a standard provision in connection with an

IPO.  But secondly, the reason was that there were some tender offers that were out and the risk

was that since we required not less than 80 percent of approval in each of three groups, someone

who acquired 10 percent of one group or only approximately 3-and-a-third percent of the in-

vestment could hold up a transaction and could blackmail the investment group in order to get a

payment to go along with the transaction.") & 7138-39 ("I think it protected the rights of the par-

ticipants against somebody, as I've said before, obtaining three-and-a-third percent of the total

and being able to block material transactions.").

> Thomas Keltner also explained the background and purpose of the poison pill:
>
> This is what, you know, might be called a pill agreement, which is I think
> as people know, has been recognized as a proper action in some cases for
> fiduciaries to protect long-term value or some strategic initiative from be-
> ing upset by a self-interested spoiler who is not really, you know, very
> rooted in the entity.
>
> So the – in late 2011, as we contemplated what turned out to be a three-
> year process or actually a two-year process from 2011, it had been going
> for a year or so then we knew we were going to be spending a lot of mon-
> ey, a lot of time and attention on a program we thought was very benefi-
> cial for the investors and we wanted to have the ability to protect that from
> a kind of greenmail or other type of spoiler who came in.
>
> And we recognized that given the extraordinarily high super majority re-
> quirements in these entities, 80 percent, not across ESB as a whole, but 80
> percent in each of three groups.  So if you think about it, you know, some-
> one could acquire a 20 percent interest in one of the participating groups
> that represent only about 7 percent of the entirety of ESBA and they could
> block this entire transaction.

T. 3505-06; see also T. 2763-64 & 4000 ("It was to protect a potential transaction into which

tens of millions of dollars had been invested and for which we had reason to believe a very high

proportion of our investors were supportive from a kind of greenmail or last minute raider who

could obtain a veto on the entire transaction by acquiring a very small percentage amount of the

whole entity.").

Case No. 01-14-0001-6896

The S-4 explained the background of the poison pill:

> During the period from November 2010 through November 2011, the [S]upervisor discussed the risk of third parties making offers to acquire interests of the subject LLCs, such as through partial tender offers, that could have the purpose and effect of blocking a subject LLC's participation in the consolidation.  The [S]upervisor determined at a meeting held in November 2011 to amend the limited liability company agreement of each of the subject LLCs to provide protections in the event of a third party acquisition of participation interests in the subject LLCs similar to that provided by shareholders' rights plans.

R-231 at 165; see also T. 3999.

Contrary to Claimants' assertions, see, e.g., T. 867-69, 4792 & 4797, the Agents had the authority to adopt the poison pill, see R-3 at ¶ 4; T. 3509 ("There was no requirement for participant consent to amend the Partnership Agreement so we were within the technical requirements of our agreements, but what we were doing was informed by a fiduciary judgment in the way that I described that that was our judgment.") & 7136-37.

Claimants did not challenge the need to adopt the poison pill or the purposes of the pill.  Plus, the poison pill, which did not change the voting rights of any participants, including Claimants, never was "invoked" and the ESBA investors voted on the proposed REIT IPO transaction.  T. 2764, 4000-02, 6748 & 7139.[18]

---

[18]    One investor chose not to buy additional ESBA units due to the poison pill:

> So after the original drafts of the consent solicitations went out, we looked at the idea, we meaning I and the folks who work with me, looked at the idea of going back out and seeing if we could acquire additional units.  And we spoke to SL Green, which is a major REIT in New York City, and we talked about partnering with them in acquiring as many interests as we could in the hopes of acquiring a significant amount of interests.  And that's when we studied the matter further, we discovered this document which we've referred to as a poison pill, additional acquisitions of units would – acquiring additional units would cause us to lose any voting rights attached to those additional units, and so therefore we decided that as a business matter we couldn't take the risk of acquiring things and not having voting rights attached to them.

46

Claimants failed to establish that the poison pill amendment was an improper exercise of the Agents' business judgment.  Therefore, we conclude that Respondents, in enacting and then publicly and duly disclosing the poison pill in a securities filing, did not breach contractual or fiduciary duties and obligations or commit securities or common law fraud.  Further, Claimants failed to proffer, let alone prove, that they suffered cognizable damages due to the poison pill.  See C-193.

Our conclusion is on all fours with Justice Sherwood's rejection of an identical poison-pill assertion in the class action arising out of this very REIT IPO transaction:

---

T. 313-14; see also T. 8013-14 ("And the other purpose of the Poison Pill was to protect the Malkin general partners, the three agents, from ever losing control over the partnership because once an investor would have accumulated 6 percent, I think it was, of the unit shares, they would lose all their voting rights.  And so the effect of that would be to discourage anybody from making an investment.  In fact, when I had conversations with SL Green about making a tender offer here for the unit shares, that was a deal killer for them.  And that would have provided a nice alternative, again, to the limited partners and was obviously something that the Malkins were very much opposed to because it would have threatened their control over the whole partnership.").

Claimants failed to establish how this claimed failure to buy additional units (assuming Claimants had proffered evidence that the investor could have done so) caused any cognizable damages to Claimants.  In fact, Claimants did not establish how the poison pill dissuaded even this investor from acquiring interests in ESBA:

Q.  You testified under examination by Mr. Griggs that you believed that an effect of the Poison Pill would be to deter folks from trying to acquire the ESBA interests.  Do you recall that?

A.  Yes.

Q.  Okay.  Isn't it a fact, sir, that the MacKenzie Capital conducted a mini tender for 18 participation interests at ESBA after the pill was adopted?

A.  Yes, that's true.

Q.  And that if [sic] fact was happening while the solicitation was occurring, correct?

A.  Correct.

T. 8084.

47

Case No. 01-14-0001-6896

Objectors' assertion that the settlement fails to compensate the ESBA Participants for implementation of a "poison pill" provision in the 2011 amendment of the LLC Agreement is meritless.  Contrary to the objection, the amendment does not change the Participation Agreement (although it impacts Participants' voting rights) and the Participants' consent is not required.  Moreover, the ESBA members had authority to approve the amendment in the valid exercise of their business judgment  .   .   .   .

According to Defendants, "[t]he 2011 amendment was adopted for several permissible purposes: (1) to protect ESBA against a hostile takeover, (2) to provide ESBA with sufficient time, leverage and negotiating room to evaluate competing offers, and (3) to prevent investors from acquiring a minority interest for the sole purpose of blocking otherwise beneficial transactions."  The [] Objectors have not shown that the decision to adopt the amendment was not a proper exercise of the managers' business judgment.

R-116 at 5 (In re Empire State Realty Trust, Inc. Investor Lit., No. 650607/2012, slip op. at 5

(Sup. Ct. May 17, 2013)); see also T. 4792-94, 4805-06 & 8083-84.

### F.   The Empire State Building Patent and Trademark Claims.

Claimants assert Respondents improperly stripped ESBA of its rights to the "Empire State Building" trademark:

As further evidence of the gross advantage taken by the Malkins in their capacity as agents of the Participants, the S-4 disclosed for the first time that the Malkins and ESBC had appropriated for themselves all patent and trademark rights to the name "Empire State Building."  The SEC filings disclosed that, in an application for trademark registration, dated May 13, 1999, and registered December 12, 2000, ESBC and the Malkins had listed themselves as the applicants and owners of record, despite ESBA's rightful ownership of the Building as confirmed in a 1999 court ruling. The registration was made without the knowledge or approval of the ESBA Participants, who had a superior claim to the intellectual property, and to whom the Malkins owed a duty of honesty, integrity, good faith and fair dealing.  In addition, ESBC's appropriation of the intellectual property rights violated the Participation Agreements by disposing of a partnership asset without the Participants' unanimous consent.

CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 56.

Case No. 01-14-0001-6896

By Quitclaim, dated as of February 1, 1999, ESBA assigned the word mark "EM-PIRE STATE BUILDING" and the design mark "DESIGN OF EMPIRE STATE BUILDING" to ESBC, subject to a reversion.  R-234 ("The Marks will be owned by Assignee, its successors and assigns, for as long as such Net Operating Subleasehold is in effect; upon termination of such Net Operating Subleasehold the Marks and the Goodwill shall revert to Assignor, its successors and assigns; and upon termination of such Master Leasehold, the Marks and the Goodwill shall revert to the holder of the interest in the Building superior to Assignor, i.e., the fee holder of the land on which the Building stands."); see also T. 1304.

ESBA was not an operating company.  T. 4199.  Consequently, as Claimants' own witness acknowledged, ESBA could not take advantage of the marks – ESBC was the proper party to exploit and use the marks.  T. 1302; see also T. 4201-02 ("And the party who is operating the building and dealing with tenants and third parties is the lessee.  It's the only party.  It's the right party.  .  .  .  The sublessee, that is ESBC, pre-IPO, was the only appropriate party to exploit and use the trademark at that time.  I'll just abbreviate that the documents provide that at the expiration of the sublease, if there is one, ESBC's right to the trademark also expires and the trademark reverts to ESBA.  So the trademark is just another, you know, property right that goes with the property in the same way that all the other property rights do here.  It's with ESBC for operation, but its ultimate residual ownership if the lease expires is with ESBA.").

The Participating Agreements stated that the Agents needed Participant consent only in certain instances.  Assigning trademarks was one of those instances because it was a way of disposing of a partnership asset.  See R-3 at ¶ 4 ("The Agent shall not agree to sell, mortgage or transfer The Property or the Master Lease, nor to renew or modify the Master Lease, nor to make or modify any mortgage thereon, nor to make or modify any sublease affecting the premis-

49

es, nor to convert the partnership to a real estate investment trust, a corporation or any other form

of owner ship, *nor to dispose of any partnership asset in any manner, without the consent of all

of the Participants*.") (emphasis added).

Consequently, this assignment of marks may have violated the ESBA Participat-

ing Agreements.  See CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 56.

However, Claimants did not challenge that (a) ESBA was not an operating company; (b) ESBA

could not exploit the marks; and (c) ESBC was the "only" party and the "right party" to exploit

the marks.[19]  Nor did Claimants quantify their alleged damages or prove that they suffered dam-

ages as a result of this assignment – and it is unlikely there were any damages because ESBA

could not exploit and use the marks.  See C-193 at G&A-6986-010060 ("The damages calcula-

tions outlined above attempt to compensate Claimants for losses associated with the value of

their investment, but do not compensate for damages that are not mathematically calculable by

Participants, due to either the nature of the damages or Respondents' total control of all neces-

sary information.   .   .   .   And, such damages include Claimants' losses associated with misap-

propriation by Respondents of the [ESB] trademark, which misappropriation was concealed from

Participants for a period of twelve years.").

For these reasons, Respondents did not breach contractual or fiduciary duties or

obligations, or commit securities or common law fraud, in connection with ESBA's assignment,

subject to a reversion, of the ESB marks to ESBC.

G.      **The Indications-of-Interest Claims.**

On or about June 18, 2013, the Supervisor received an "indication of interest"

from Stephen B. Meister, on behalf of Cammeby's International, to purchase the ESB for $2 bil-

---

[19]      The projected exchange value of the trademark licensing fees was approximately
$85,000.00 per year for each of the twelve years starting June 1, 2013.  R-231 at C-1-21; see also T.
4203-04.  ESBA and ESBC shared equally in the profits realized from the use of the marks.  T. 1303-04.

Case No. 01-14-0001-6896

lion.  C-41 at G&A-6986-008251-252.  On or about June 21, 2013, the Supervisor received an indication of interest from Philip Pilevsky, on behalf of Philips International Holding Corp. and Princeton Holdings LLC, to purchase the ESB for $2.1 billion.  Id. at 008253-54.

The Supervisor thereafter received an indication of interest, dated July 2, 2013, from Reuven Kahane, on behalf of RKRE INCRPORATED [sic], to purchase the ESB for $2.25 billion.  Id. at 008255-56.

The Helmsley Estate's consent was required for any sale of the ESB.  Id. at 008227 ("The Helmsley estate and Malkin Holdings group, as participants, each has effective veto power on major decisions (including a sale) related to ESB as each group has greater than 20% ownership interest in ESBC (i.e., operating lessee).  The Helmsley estate owns 63.75% of the participation interests, while principals of the Supervisor have a 23.75% voting interest.") & 008223 ("The estate owns 63.75% of the participation interests in ESBC, which represents a potential blocking position to any consent process related to major decisions for the property.").

On July 22, 2013, the Helmsley Estate informed the Supervisor that the Estate declined to accept or pursue any of the indications of interest.  Id. at 008317 ("The estate declines to accept or pursue any of the indications of interest that have been received for the purchase of the [ESB].  In its own interest and independent of your analysis, the Estate intends to continue on the IPO path, and to adhere to the agreement that we entered into with you concerning the IPO."); T. 5379.

In early July 2013, the Supervisor retained Lazard Frères & Co., which until then was not involved in the REIT IPO, as an independent financial advisor to review and issue a report regarding the indications of interest.  R-124 & R-126 ("The meeting participants agreed that, while all of the firms that had been interviewed were highly qualified, Lazard Frères & Co.

Case No. 01-14-0001-6896

("Lazard") was the preferred choice.  .  .  .  At the conclusion of the discussion, Messrs. Peter

L. and Anthony E. Malkin, on behalf of the Supervisor and as members of ESBA, agreed that the

Supervisor should seek to retain Lazard as an independent financial advisor  .  .  ."); see also

T. 2523.

       Matthew J. Lustig, Lazard's Managing Partner of North America Investment

Banking and Head of Real Estate, led the Lazard team.  See R-125 at R_000033818.  The Super-

visor provided Lazard with the indications of interest and other documentation regarding the

REIT IPO.  T. 2531; C-41 at G&A-6986-008222.

       At an August 8, 2013 meeting with its legal advisors, the Supervisor agreed to

await the Lazard report before responding to the indications of interest.  R-130 at R_000033102

("A discussion of the terms of the indications of interest followed, including a discussion of the

time period set forth for closing the proposed transactions contemplated by the indications of in-

terest, the provisions contained in certain of the letters received concerning participants having

an option to receive an interest in the acquiring entity, the purchase prices and the lack of speci-

ficity as to the terms of the transaction included in the letters received.  Among other things, the

participants in the meeting discussed whether there should be follow up with parties who had

contacted them and determined to defer a decision until after they had received a report from

Lazard.").

       On September 4, 2013, Lazard issued its report that summarized, among other

things, the benefits of the REIT IPO as well as the difficulties associated with a potential

standalone sale of the ESB.  C-41 at G&A-6986-008235-36.

Case No. 01-14-0001-6896

Later that day, at a meeting Anthony Malkin and Peter Malkin attended on behalf of both Malkin Holdings LLC and ESBA, Lustig stated that the indications of interest did not contain terms he would expect from a party submitting a serious bid:

> The meeting participants then discussed the indications that had been received to date, and Mr. Lustig compared them to what he might expect to advise a client to provide in the event his client was interested in purchasing one of the properties in question.  He stated that the letters did not contain terms that he would expect from a party submitting a serious bid for the properties.  He would have expected much more extensive terms that address all of the issues, and would have expected that a proposed form of purchase contract would have been included.  There was a discussion of the potential reasons that the indications came in the form they did.
>
> .   .   .   .
>
> In response to a question, Mr. Lustig stated that under the circumstances, including the impact on the IPO of pursuing any proposal and the deficiencies in the proposals received, it was reasonable not to pursue further discussion with bidders before making a decision on the offers.  In response to another question, Mr. Lustig stated that as a personal matter (and not speaking on behalf of Lazard) he would advise an investor who asked for his advice what to do that nothing that is included in the indications would cause him to want to halt the Transaction to pursue the indications.

R-135 at 2-3.

On September 6, 2013, the Supervisor and ESBA members met to discuss further the indications of interest.  They discussed the Lazard Report and presentation, including Lazard's view that the indications of interest were not credible alternatives to pursuing the REIT IPO.  They decided the REIT IPO should proceed for several reasons, including that (a) the Helmsley Estate refused even to entertain any of the indications of interest and instead wanted to proceed with the REIT IPO; and (b) the investors had given overwhelming support to the REIT IPO.  R-136 ("Anthony E. Malkin opened the meeting by stating that the Report and Lazard's presentation supported a view that the indications were not credible alternatives to the IPO.  As Lazard had noted at the meeting, serious proposals would have looked very different from what

had been received.  Peter L. Makin and Mr. Keltner agreed.  ¶Anthony E. Malkin noted that, with the substantial expenditures on the proposed REIT IPO to date, with the overwhelming support of the investors that had been received, with the Helmsley Estate having stated that it does not intend to entertain a sale but wishes to go forward with the IPO, among other reasons, the Supervisor and the members of ESBA  .   .   .  should move forward with the lPO, and inform the investors of this decision as soon as possible.  Peter L. Malkin and Mr. Keltner agreed.").

On September 6, 2013, the Supervisor informed the Participants that the REIT IPO should proceed.  R-224 at R_000000178 ("As we have previously advised you, Malkin Holdings received indications of interest to purchase the fee and/or operating lease positions of the [ESB].   .   .   .  ¶As fiduciaries, we review all matters concerning investment groups we serve.  In our review of these indications of interest, we engaged Lazard Frères & Co. LLC as an independent financial advisor.  After our review, we have concluded that it is in your best interest to proceed with the consolidation and IPO as approved by a supermajority of the Participants."); T. 4238.

On September 9, 2013, Stephen B. Meister sent the Supervisor an indication of interest, on behalf of Thor Equities, to purchase the ESB, including the Master Lease, for $1.4 billion.  R-137 ("Enclosed please find a revised offer from an affiliate of Thor Equities ("Thor") offering to purchase fee title to the [ESB] (and the Master Lease) from [ESBA] for $1.4 billion. This offer is materially greater than the allocated portion of the [ESB] appraised value.").

The Supervisor at this time decided not to entertain any additional indications of interest, and so informed the Participants on September 19, 2013:

> As reported in our filings, we received unsolicited proposals to purchase the fee, master lease, and/or operating lease positions of the [ESB].  Most recently, a $1.4 billion offer for free and clear title to [ESBA's] fee and master lease interests was received.   .   .   .

Case No. 01-14-0001-6896

> As fiduciaries, we review all matters concerning investment groups we serve, including every unsolicited proposal.  We engaged Lazard Frères & Co. LLC as an independent financial advisor.  Among other things, we considered: (i) the potential to close any indication of interest submitted; (ii) the thousands of conversations with participants before, during, and after the prior consent; (iii) the costly, complicated, and time-consuming SEC filing and consent process required to allow any potential transaction to go forward (which no proposal accommodated); and (iv) the costs of the consolidation and IPO to date.  We determined none of the proposals is a credible alternative to the approved consolidation and IPO.

> While it is possible that additional proposals will be made, from this point we are fully committed to effecting the consolidation and the IPO transaction and will not entertain any additional alternative.  .   .   .

R-143.

Claimants allege Respondents breached their fiduciary duties by refusing to seriously entertain any indications of interest.  CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 70 ("Respondents refused to engage in discussions or otherwise seriously entertain any of these offers, dismissing both the credibility and good faith of the offering entities, notwithstanding the premium above the $1.18 billion exchange value assigned to ESBA as part of the REIT.  Still, despite Respondents['] refusal to engage, the bidding war for the ESB continued."); see also id. at ¶¶ 68-76.  We disagree.

*First*, the Helmsley Estate on July 22, 2013 unequivocally told the Supervisor that it refused to pursue the indications of interest.  C-41 at G&A-6986-008317; see also id. at 008229.  On August 20, 2013, after receiving additional indications of interest, the Helmsley Estate reaffirmed its position:

> The estate declines to accept or pursue any of the indications of interest that have been received for the purchase of the [ESB].

> .   .   .   .

> Furthermore, for various reasons, until the IPO will have been withdrawn, the Estate would not consent to the marketing of the [ESB] for a private

Case No. 01-14-0001-6896

> sale.  For example, the time required to complete a private sale, requiring a
> marketing of the building, SEC review and effectiveness of the consent so-
> licitation documents, and the completion of the consent solicitation pro-
> cess, could easily take ten to twelve months.  As long as the IPO process is
> continuing, the Estate is unwilling to take the risks of an uncertain market,
> the possible failure to obtain the necessary consents and the possibility
> that no private transaction will be consummated.

Id. at 008318; see also id. at 008229 ("In a letter dated August 20, 2013  .  .  .  counsel for the

Helmsley estate reaffirmed its intention to pursue the IPO and further stated that it would not ac-

cept any of the indications of interest received to date and would not consent to the private sale

of ESB as long as the Consolidation process is continuing."); T. 5379.

Given the Helmsley Estate's effective veto power over any ESB sale, the Estate's

position made impossible any sale pursuant to any indications of interest:

> Q.  All right.  How, if at all, did these letters factor into your assessment of
> the indications of interest?
>
> A.  Well, it rendered it very difficult to pursue, given that the operating
> partner to the [ESB] was against entertaining an indication of interest to
> sell the property and that it provided more basis to continue on the road to
> the IPO.

T. 5382; see also C-41 at G&A-6986-008229.

*Second*, the Supervisor, as part of its due diligence, promptly undertook a thor-

ough review of the indications of interest.  It retained Lazard as its financial advisor and provid-

ed Lazard with information concerning the indications of interest and the REIT IPO.  R-125 &

R-135; C-41.  In early September 2013, Lazard delivered its report to the Supervisor.  Id.  The

report stated clearly that the REIT IPO was a preferable course; the report extensively listed the

advantages of the REIT IPO, in contrast to the indications of interest that were subject to multi-

ple uncertainties and risked eliminating the IPO window.  Id. at 14-15, 20-23 & 29-30; see also

R-135 at 1; R-143.

Case No. 01-14-0001-6896

*Third*, there was serious concern that considering any indications of interest, even if none ultimately was pursued, would "seriously chill the market, [the] target market for the IPO," which took place only a few months later.  Based on timing and other circumstances, it would have been highly risky for the REIT IPO to pursue any indications of interest.  T. 4225 ("As I mentioned, we had received the necessary investor consents in June.  So we were in a mode of executing on the IPO.  The investment bankers at Goldman Sachs and Bank of America Merrill Lynch and others were conducting road shows.  They were consolidating commitments. They were traveling around the world.  And they advised us that if we even pursued alternatives, the investors would say I'm not sure this is happening; I'm not committing you know my allocation to this.  It would very seriously chill the market, our target market for the IPO, which ended up, as you know, happening in early October, just a few months away from these events.").

*Fourth*, there were multiple reasons to question the merits and good faith of the indications of interest.  For example, Stephen Meister, who was litigation counsel for the intervenors who had tried to stop the REIT IPO, Stephen Meister's son, and Mr. Penson, another adversary who also was in litigation with Respondents, all sent multiple indications of interest to the Supervisor.  C-41 at G&A-6986-008251-52, 008258-259 & 008260-264; see also T. 4210 & 4929 ("And I viewed these as last minute offers that were not – they were designed to derail a beneficial transaction for the investors and not help the investors get more."); R-135 at R_000033111.

The indications of interest appeared to be thrown together at the last minute and did not contain the customary terms and conditions that would signal good faith offers.  T. 5377 ("Also I considered the offers or the indications of interests to be very flimsy in nature.  That is, they did not generally have the types of terms and conditions that one who is entertaining such

57

an offer would normally be expected to see, especially in many cases these came really what I consider on the eve of the IPO, so they would really have to effectively move the needle to be compelling in any form or fashion and they weren't. They also had a lot of provisions that I believe to be nonstarters, things like timelines that would not have matched up with what the necessary timeline would be to obtain things like SEC consent and clearance.").

The provisions that reflected a lack of good faith included the following:

- Break-up fees payable to the buyer. C-41 at G&A-6986-008272; see also T. 4210 ("I think one of them or two of them had a breakup fee that sort of went in reverse. We would have to pay them, we would have to pay the purported offerer if the transaction did not go through. That was a big part of the reaction we had.").

- Fully refundable and/or small buyer deposits. C-41 at G&A-6986-008261 & 008267; see also T. 4209 ("They had a light deposit.").

- Immediately effective standstills and restraints on new lease transactions and expenditures by the ESB. C-41 at G&A-6986-008260 & 008266; see also T. 2518-19, 2521 & 4210 ("Some of them typically wanted us to, in effect, cede control of our operations or of our leasing program by suspending those activities or conducting those activities only with their consent, which would be remarkable, you know, in the face of these, you know, this very light commitment, this very light indication of interest.").

- A mere ninety-day period to close. C-41 at G&A-6986-008230; see also T. 2518-19 & 4209 ("They had a closing period that took no account of the fact that we would need at least one year to get permission to close the [ESB].").

Further, some indications of interest appeared to be from dubious sources, including one for $2.25 billion on behalf of unidentified investors "who live in the Ukraine and Russia." C-41 at G&A-6986-008255. Another indication stated: "I want you make a serious offer. . . . It is big failure and a mirakel [sic] not contact me and listening what I have to say!" Id. at 008283.

The more sophisticated investors who submitted indications of interest presumably understood that the timing of the proposals, the unusual terms and conditions, and the requirement of a resubmission to the SEC for a new vote of ESBA Participants rendered their proposals unrealistic.  C-41 at 008260; T. 2518-19.  None of those offerors had made any overtures before or during the REIT IPO solicitation, despite the public nature of that process.  T. 4209.  To the contrary, despite widespread publicity for years, no indications of interest were submitted to the Supervisor until shortly before the scheduled REIT IPO and only after the Supervisor had secured Participant consent.  T. 4298 ("It had been, you know, very public that we had been soliciting consents for action regarding the [ESB] and others through an SEC, a lengthy SEC process."), 5377 & 6564.

> *Fifth*, Claimants failed to establish causation to support their claim that they suffered harm due to Respondents' alleged refusal to consider seriously the indications of interest.  Claimants presented no testimony or other evidence to suggest that a transaction in fact would have resulted from any indications of interest, much less that any transaction would have yielded a more favorable result for the Participants than the REIT IPO.  Nor did Claimants establish that there would have been a vote in favor of any indications of interest if presented to the Participants, let alone that any indications of interest would have ripened into a consummated transaction.[20]

---

[20]      As set forth in the S-4, the Participants had the opportunity to authorize a "Third-Party Transaction" as a potential alternative to the proposed publicly traded real estate investment trust.  The S-4 summarized the Third-Party Transaction as follows:

> The third-party portfolio transaction would be undertaken only if the aggregate consideration is at least 115% of the aggregate exchange value for the subject LLCs, the private entities and the management companies included in the third-party portfolio transaction and certain other conditions are met.  The proposal must provide for all cash, payable in full at closing, but such proposal may provide for an option for all participants to elect to receive securities as an alterna-

Case No. 01-14-0001-6896

*Sixth*, Claimants did not present evidence of the damages they allegedly suffered because of the Supervisor's failure to enter into a transaction based on an indication of interest. See C-193.  Absent this proof, it would be impossible to assess damages.

The issues discussed and conclusions set forth above were persuasively presented by Respondents' expert Paul Habibi at the evidentiary hearing and memorialized in his expert report, dated May 9, 2016.  See R-171 at 9 ("Each of these indications of interest proved to be an inferior alternative to the ESRT IPO.  In addition to the unique challenges specific to each of the offers  .   .   .  several obstacles prohibited the pursuit of the ESB, including: i. During the solicitation process for the REIT IPO, Participants did not consent to the option of a portfolio sale at 115% of exchange value; ii. The Helmsley Estate rejected the indications of interest in favor of an IPO, and the estate's consent would have been required of any sale that would have involved ESBC; iii. The time frame required to obtain consents for any of the third-party indications of interest would have jeopardized the IPO that Participants had overwhelmingly approved.") & 18; T 5376 ("For numerous reasons I determined that it was not in the best interests of ESBA to pursue those [indications of interest].") & 5375-5408.

---

tive to cash.  If the proposal provides for a securities option, the Malkin Family will have the right to elect to receive securities only on the same proportional basis as other participants.  No member of the Malkin Family will be an affiliate, consultant, employee, officer or director of the acquiror after the closing or receive any compensation from the acquiror (other than their pro rata share of the consideration that they will receive in the third-party portfolio transaction).

R-231 at 1.

The Participants rejected the Third-Party Proposal.  C-79 at G&A-6986-008560; see also T. 4209 ("It was public information that our proposal, the so-called third-party sale, did not pass.").

This suggests – but does not establish – that the Participants would not have voted in favor of any indications of interest.  Cf. RESPONDENTS' POST-HEARING BRIEF at 71 ("[T]he indications were subject to multiple uncertainties  .   .   .  and risked completely eliminating the IPO window, given the stigma of a 'pulled' IPO.  Further the ESBA Participants had *rejected* the Third Party Proposal, which would have authorized a portfolio sale.") (emphasis in original).

60

These conclusions are further supported by the testimony of Respondents' expert Gerald D. Pietroforte at the evidentiary hearing and memorialized in his expert report, dated May 9, 2016.  R-173 at 33 ("Based on the Helmsley Estate's rejection of the Indications and the issues associated with a third-party sale (such as the time that would have been required to solicit Participant consent for a sale), the Supervisor determined that there was no practical way to accept any of the Indications of Interest.  The Supervisor also appropriately noted the many defects and challenges with the Indications themselves.  As a result of this course of conduct, the Supervisor fulfilled its duties related to the Indications of Interest."); T. 6554-6568.

For these reasons, we conclude that Respondents did not breach contractual or fiduciary duties or obligations, or commit securities or common law fraud, when they did not pursue any of the indications of interest to purchase the ESB.

**H.    The Claims Relating to the Suburban Office Properties.**

Claimants allege Respondents improperly included certain "underperforming" suburban office buildings in the REIT IPO transaction:

> For the Malkins, a primary advantage of the consolidation was the opportunity to cash out their investments in underperforming suburban properties, and procure reimbursement for their tax liability through the tax protection provisions built into the REIT transaction.  The capital improvement program facilitated this opportunity in two important ways.  First, the Malkins used the ESB's diminished annual revenues during the capital improvement program to suppress the ESB's relative appraisal value in the run-up to and promotion of the REIT.  Then, they relied on soaring future revenues projected from the refurbished ESB to offset the diminishing or stagnant returns projected from the consolidated suburban properties.  The Malkins thereby planned to shift the risk from their undesirable investments to the ESB, dispose of those properties, and secure for themselves $97.7 million in potential tax relief.

CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 40; see also id. at ¶ 78 ("In addition, the Malkins received  .   .   .   subsidization of their less valuable suburban investments.").

Case No. 01-14-0001-6896

According to Claimants, including the suburban properties adversely affected the ESRT share price.  T. 6931 ("There's no monetary damage that you can trace directly to the allocation method, but you saw that there was a percent discount in the way the market reacted to the REIT and we believe part of that was due to the inexperience of the Malkins in doing REITs, and part of that was due to the perception that the suburban properties created because they're in the REIT."); see also T. 6936.  However, Claimants did not proffer any evidence or expert testimony to support this assertion.  See T. 6932-34.

Moreover, Claimants did not show how the suburban properties dragged down the REIT IPO transaction.  In fact, Claimants did not contest that these properties "performed very well.  They ha[d] top tier tenants, name brand tenants  .   .   .  .  They're very good."  T. 2833; see also T. 4912 ("I thought that these were good investments.").

Also, Claimants did not dispute that including the suburban properties in the transaction diversified the REIT.  T. 3295 ("I mean one of the other benefits is diversity.  These are projections.  You can't guarantee results and it's, you know, a fundamental of investing to, you know, spread your bets around a little bit.  For someone who's only in Empire, this was a chance to diversify a little bit and still keep half of Empire if you wanted it or sell part of it, because now you had a good liquidity feature in your investment which you had not had for 60 years.") & 3300.

Nor did Claimants contest that the REIT IPO may well have foundered – or would not have been able to "compete" from a valuation perspective with other REITs – if the transaction did not include the suburban properties; Respondents' investment advisors advised that investors "do not want to see split allegiances of management in REITs and [if there were] properties in the greater New York metropolitan area which were not included in a REIT based in New

Case No. 01-14-0001-6896

York, they would see that as incorrect."  T. 2832-33; <u>see also</u> T. 2923 & 6750-51 ("I felt that the [ESB] was at an unusual risk as a single operation and since the rest of our buildings were operating very profitably; that is, that our office and retail buildings in Manhattan, it would be much safer for the investors and it would also create a much stronger, higher credit entity if we put together all of these office buildings and retail.  And then we were told by the investment bankers that we had to include any property that might be competitive, so that it had to include the suburban office buildings which directly competed with the Manhattan office buildings.").

And the suburban properties did not receive inappropriate outsized valuations.  As Claimants' own witness conceded, their relative values were reflected in lower calculated exchange values; Duff & Phelps in determining exchange value capitalized the lower cash flows of the suburban properties at a lower multiple compared to the ESB.  T. 411; <u>see also</u> T. 3296, 3622-23 ("And if any property was lagging in some respect, it had less substantial growth than you think it should have, that would be reflected in its share of the consolidation proceeds.  So all of these things were really self-correcting."), 3625 & 3903-04.[21]

For these reasons, we conclude that Respondents did not improperly or wrongly include the suburban office properties in the REIT IPO transaction.  We also conclude that Re-

---

[21]    One suburban property, for instance, had a mere fractional exchange value:

> Q.  And we were talking about the relative valuations of the suburban properties and I think Mr. Griggs was asking you about for Stamford Place last time around.  Can you tell us what the percentage of the total exchange value for all the properties was that was allocated to First Stamford Place?
>
> A.  0.2 percent.
>
> Q.   And how much was allocated to the [ESB] and the constituent entities, ESBA and ESBC?
>
> A.  Approximately 56 percent.

T. 3909-10.

Case No. 01-14-0001-6896

spondents did not thereby breach contractual or fiduciary duties and obligations or commit securities or common law fraud.

Even if the "suburban-properties" claims had merit (and they do not), our November 17, 2017 order confirmed that Claimants abandoned these claims:

> We hereby confirm that Claimants' claims do **not** include any claim for damages arising from (a) the allocation of the value of the "suburban properties" compared to the value of the Manhattan properties generally or to ESBA/ESBC specifically; or (b) any improper, unfair, erroneous or inappropriate allocation or any breach of fiduciary duty arising from the allocation of the value of the "suburban properties" compared to the value of the Manhattan properties generally or to ESBA/ESBC specifically.

(Emphasis in original.)  See also T. 4697 ("Let me just make clear that we've never taken the position that the allocation done by Duff & Phelps among any of the entities was improper or inappropriate nor are we challenging it."), 6944 & 7192 ("Q: I don't recall that you have claimed in the past that the suburban properties, the inferior properties were overvalued.  MR. GRIGGS: That is not a claim on which we submitted expert valuation testimony.").

I.   **The Tax Indemnity Claims.**

Claimants claim Respondents improperly obtained outsized tax relief in connection with the REIT IPO transaction.  CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 40 ("The Malkins thereby planned to shift the risk from their undesirable investments to the ESB, dispose of those properties, and secure for themselves $97.7 million in potential tax relief.") & ¶ 78; T. 124 ("a tax protection agreement for a person who stands to earn I believe 73 million units struck me as overly generous."); C-89.

Keltner explained the tax protection agreement as follows:

> It's an undertaking by the, you could say the REIT and by the operating partnership, it's an undertaking by the enterprise to reimburse certain sponsoring parties for phantom income that they would recognize on the disposition of certain identified assets.

Case No. 01-14-0001-6896

In this case the tax protected parties were essentially Malkin family members and another family whose name I can't remember now, and they applied to I think four assets, which is somewhat marginal in the portfolio, they were the tax protected assets because they were the ones that had very large embedded phantom income for those tax protected parties.

We were advised that – and we've seen that this type of tax protection is a relatively customary feature in consolidations like this and the obligation for reimbursement arises if the enterprise chooses to sell one of those properties. It's another part of the equation in determining whether or not to sell.

The obligation expires after a fairly substantial period of time. I think it varied with different assets, but it was more or less the lifetime of Peter Malkin and his wife Isabel or 12 years, whichever is sooner. So that's how the tax protection agreements arose and that's how they worked.

T. 3924-25; see also T. 3928, 6887 ("These are agreements that are effective only if the properties to which they relate are sold by [ESRT] and it's a standard agreement a rollup [sic] where control over sale is surrendered to an independent Board of a new entity."), 6888 ("What they're referring to is properties, I believe, that have a negative basis. So that in the event of a sale there would be a tax that would come up for which there wouldn't be any cash to pay the tax. And so is it's typical that when sponsors who have controlled properties give up their control, that they are protected for a reasonable period of time against the decision that would sell the property without their having the opportunity to prevent it. So it's to prevent a tax that would arise on a sale that the sponsors of the rollup would never have authorized because of the negative impact upon them.") & 6890.

The S-4 fully disclosed the structure and consequences of, and the reasons for, the tax protection agreement:

As part of the consolidation, the operating partnership intends to enter into a tax protection agreement with Peter L. Malkin and Anthony E. Malkin pursuant to which the operating partnership will agree to indemnify the Wien group and an additional third party investor in Metro Center (who

65

Case No. 01-14-0001-6896

was one of the original landowners and was involved in the development of the property) against certain tax liabilities  .   .   .   .   The company believes that it is consistent with market practice for significant contributing unitholders, such as the Malkin Group and the one additional third party investor in MetroCenter, to be indemnified against certain tax liabilities as set forth in the tax protection agreement.   Accordingly, the company believes it is appropriate to enter into a tax protection agreement.   The operating partnership estimates that if all of its assets subject to the tax protection agreement were sold in a taxable transaction immediately after the IPO, the amount of the operating partnership's indemnification obligations (based on tax rates applicable for the taxable year ending December 31, 2012, and exchange values, and including additional payments to compensate the indemnified partners for additional tax liabilities resulting from the indemnification payments) would be approximately $97.7 million (which will be $119.6 million beginning after December 31, 2012 if certain sunset provisions under the Internal Revenue Code are not altered or reversed).

R-231 at 56; see also T. 3928.

Claimants did not challenge that the tax protection agreement was (a) a relatively customary feature in consolidation" such as the REIT IPO transaction; and (b) consistent with market practice.  See T. 151.  Nor did Claimants proffer evidence that it was inappropriate or improper to provide this tax protection.  Further, Claimants did not establish that they suffered any loss or damage by reason of the tax protection agreement.  See C-193.  In fact, the agreement never has been implemented.  It is triggered only upon a sale of any of the referenced tax protected entities or by another referenced triggering event.[22]  However, Respondents have no inten-

---

[22]    Keltner identified another event that could trigger the tax protection:

There's one technical addition to that, which is if one of the tax protected properties were to have a disposition that reduced the non-recourse tax basis for investors and it created phantom income, that's another way in which it could happen.

That would happen if mortgage debt existing on the tax protected assets were reduced by a substantial amount, that would reduce the tax basis for those tax protected investors in a way that would cause them to recognize phantom income.

T. 3935.  However, this "technical addition" never has been triggered.  T. 3927 (confirming that "to date Mr. Malkin and his wife and anyone else has not received a penny by reason of this tax protection agreement").  Cf. R-231 at 56 (identifying other events that could trigger the tax protection).

Case No. 01-14-0001-6896

tion of disposing of any of the referenced properties, none has been sold, and none of the other triggering events has occurred. T. 3926 & 6887 ("none of these properties have had a sale and there is no present intention of any of them being sold, but that will be decided by the independent board of [ESRT]").

For these reasons, we conclude that Respondents did not breach contractual or fiduciary duties and obligations or commit securities or common law fraud in connection with the tax protection agreement.

J.    **The Claims Relating to the Release of the Malkins' Personal Tax Guaranties.**

Claimants claim the Malkins in connection with the REIT IPO transaction received personal tax indemnities worth more than $1 billion:

> Respondents received enormous financial compensation and other advantages, which resolved numerous conflicts of interest in Respondents' favor.  .   .   .  [T]he Malkins received  .   .   personal tax indemnities worth over $1 billion  .   .   .   .

CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 78; see also T. 124 & 1513; cf. T. 125 ("That was not as much of a concern.").

Keltner explained the backup indemnities that the Malkins, for no compensation, previously had provided as an accommodation to ESBA:

> As is customary in non-recourse mortgage loans, there's a so-called exculpatory carve-out whereas a party is personally liable for certain kind of bad acts.  The core one would be declaring bankruptcy, but it could also be, you know, fraudulent misapplication of proceeds from the property.
>
> So that carve-out indemnity, sometimes called a bad-boy guarantee or a good guy guarantee or something like that, is a supplement to a customary mortgage financing.  The lender otherwise has no recourse to anyone except the property, but it has a recourse to those guarantors in the event of some bad act like bankruptcy, fraud, et cetera.

Case No. 01-14-0001-6896

> So someone needed to step up and give those guarantees in order for the mortgage financing to go forward.  There was nothing, you know, built into our organizational structure that designated anyone for that purpose.  And Peter [Malkin] and Tony [Malkin], you know, stepped up and did that, so that's how they became those, you know, carve-out guarantors with respect to mortgage financings.

T. 3928-29; see also T. 1514-15 ("We have provided the backstop for certain exculpatory carve-outs.  By any common nomenclature, these are absolutely, positively not personally guaranteed loans.  And any witness or expert, excuse me, brought in as a witness would say that these loans were positively nonrecourse loans.  Within the context of mortgage lending, lending of any kind post the savings and loan crisis of the late '80s, early '90s, nonrecourse loans included things call [sic] exculpatory carve-outs, and if you look through the rest of the section, it speaks specifically to the issues; fraud, misappropriation of funds, intentional breach, bankruptcy, and certain environmental matters.  And then if you read further, it states that we were already indemnified, we were doing this in a representative capacity because there was nobody else to do it.  The alternative was not getting loans, the alternative was collapsing the organizational structures of the partnerships."), 2174 ("So in a representative capacity, as we had with all loans since this was put in place, we signed personal guarantees and that loans in other buildings, other properties, absolutely standard practice in non-recourse loans that you need a live person to stand behind the exculpatory carveouts.  That's what we did in a representative capacity for which we're indemnified by the general partnerships on whose behalf we signed them."), 4166-67 ("I think it was an ongoing practice of theirs to step into that responsibility."), 6545, 6548 & 6638 ("My understanding of the bad boy guarantees that were signed by the supervisor, there was no obligation for them to do so and they signed them and they got relief from those guarantees upon the IPO issuance.").

Keltner explained the reasons for releasing the Malkins from these guaranties:

Case No. 01-14-0001-6896

Q.  And in connection with the REIT transaction, what was done with respect to these so-called bad-boy guarantees that the Malkins had previously provided?

A.  There was a substitution of the guarantor.  The Malkins were released from those guarantees and the substituted guarantor was the new enterprise, now consolidated with a substantial balance sheet now qualifying as a guarantor in the eyes of the lenders for this purpose.

T. 3930; see also T. 1515.[23]

---

[23]  The S-4 provided a thorough explanation of these releases that was consistent with Keltner's testimony:

> Peter L. Malkin and Anthony E. Malkin will be released from or otherwise indemnified for liabilities arising under certain guarantees and indemnities with respect to approximately $1.11 billion of mortgage loans (including currently undrawn amounts) on the company's properties, which will be assumed by the company upon closing of the IPO and the consolidation in respect of obligations arising after the closing.  The guarantees and indemnities with respect to mortgage loans of many of the existing entities, including the subject LLCs, were undertaken by Messrs. Malkin and Malkin to meet a conventional lender requirement which became standard only long after such entities were formed.  In each case, Messrs. Malkin and Malkin provided such guarantee while serving in a representative capacity as an agent or member of a subject LLC or private entity which was then seeking a mortgage loan.   .   .   .   The company believes that since the mortgage loans relating to the guarantees and indemnities will be assumed by the company upon closing of the consolidation, and it will have greater financial resources than the individual property owning entities which are subject to the mortgage loans, it is appropriate, and consistent with market practice, for Messrs. Malkin and Malkin to be indemnified by the company's operating partnership if the lenders do not consent to the release of these guarantors and/or indemnitors.  Under the organizational documents of the subject LLCs and private entities and applicable law, Messrs. Malkin and Malkin are already generally entitled to indemnification from the participants in the subject LLCs and the private entities for liabilities incurred by them in good faith and not arising out of their own willful misconduct or gross negligence, including any such liabilities under these guarantees and indemnities.  In addition, in connection with future mortgage loans that the company would enter into in connection with future property acquisitions or refinancing of the company's properties, the company intends to enter into any necessary guarantees directly, and neither Messrs. Malkin and Malkin nor any of the company's other directors, executive officers or stockholders would be expected to enter into such guarantees[.]

R-231 at 57; see also id. at 280 ("Peter L. Malkin and Anthony E. Malkin will be released from or otherwise indemnified for liabilities arising under certain guarantees and indemnities with respect to approximately $1.11 billion of mortgage loans (including currently undrawn amounts) on the company's properties, which will be assumed by the company upon closing of the IPO and the consolidation in respect of obligations arising after the closing.  The guarantees and indemnities with respect to mortgage loans of many of the existing entities, including the subject LLCs, were undertaken by Messrs. Malkin and Malkin

69

Case No. 01-14-0001-6896

Claimants did not submit any evidence that it was atypical, improper, or inappropriate to release the Malkins from their respective personal tax indemnities and guaranties.  Cf. T. 151 ("Q. Do you have any knowledge as to whether those, those types of provisions are typical in rollup transactions or transactions of this kind?  A. I'm not aware if they're typical.  Q. Or not, right?  A. Correct.").  See T. 1518 ("This is all common practice in the real estate business and anyone who is a real estate practitioner would say the exact same.").

Plus, Claimants did not suffer any harm, injury, or damage as a result of these releases.  But for these releases and the substitution of ESRT as guarantor, the Participants would have remained liable to indemnify the Malkins for liabilities under their respective guarantees.  See R-3 at ¶ 8 ("Except as provided in paragraph 6 hereof, the Agent shall not be personally liable for any act performed in good faith on or after January 1, 1962, nor for any obligation arising on or after January 1, 1962, unless due to the Agent's wilful misconduct, gross negligence or unless arising out of any liabilities under the Securities Act of 1933.  The Participants shall indemnify the Agent in proportion to their interests in The Property against any loss or liability to which the Agent may be subjected by reason of acting as Agent hereunder.  Such indemnity shall not apply, however, to any loss or liability resulting from obligations incurred prior to January 1, 1962, or resulting from obligations incurred at any time in bad faith or in contravention of the terms of this agreement."); R-231 at 57; T. 1516 ("We were indemnified by the assets of the entities on whose behalf we made these guarantees."), 2714, 3930, 6735 & 6872 ("As I said before, we didn't have that ultimate liability.  We were completely indemnified by the individual partnerships.  We undertook it without compensation as agents in order to get the mortgages for the partnerships."); cf. T. 153 ("Q. Now the indemnification provisions that you talked about that

to meet a conventional lender requirement which became standard only long after such entities were formed."); T. 1517-18, 6639, 6641 & 6886.

70

Mr. Malkin, Peter Malkin and Anthony Malkin got, are you aware of their prior rights to indemnification prior to the REIT transaction?  A. No, I'm not.  Q. Are you aware that entity by entity they had indemnification rights from the investors?  A. I was only aware of ESBA.").

Moreover, the guaranty agreements never have been triggered.  So, contrary to Claimants' assertion, CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 78 ("[T]he Malkins received  .   .   .  personal tax indemnities worth over $1 billion  .   .   .  ."), there is no way, based on the evidence presented, to determine the "worth" of the now-released personal tax indemnities.  See C-193.

For these reasons, we conclude that Respondents did not breach contractual or fiduciary duties and obligations or commit securities or common law fraud in connection with the releases of the Malkins' guaranties.

**K.** **The Buyout Claims.**

Claimants contend the "buy-out" provisions in the Participation Agreements were coercive and confiscatory:

- "Respondents then forced those Participants who had opposed the transaction, including Claimants, to consent under threat that their investments otherwise would be confiscated."  CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 5.

- "Respondents blatantly exploited this provision to intimidate Participants into approving the proposed consolidation, and ultimately to coerce Claimants into changing their votes and consenting against their will to a proposed transaction that was clearly adverse to their interests."  Id. at ¶ 29.

See also id. at ¶¶ 57, 65, 67, 105 & 113.

The S-4 explained how an investor triggered a buyout and the consequence of a buyout:

Case No. 01-14-0001-6896

> The buyout provision[] for [ESBA] .  .  . [is] triggered only if a super-
> majority consent is received with respect to either the consolidation or the
> third-party portfolio transaction by the applicable participating group.
> Unanimity on the consent is required pursuant to the organizational docu-
> ments of [ESBA] .  .  . with respect to both the consolidation and the
> third-party portfolio proposal for the consent of a participating group;
> therefore, a participant in [the] subject LLC[] who does not vote in favor
> of such proposal (**and does not change his or her vote after notice that
> the request supermajority consent has been obtained**) will be subject to
> this buyout regardless of whether either or neither transaction is consum-
> mated or the required consent of other participating groups is received.

R-231 at 14 (emphasis in original); see also id. at 16 ("The buyout amount, which is equal to the

original cost less capital repaid, but not less than $100, is currently $100 for the interest held by a

participant in [ESBA] .  .  . per $10,000 original investment for [ESBA] .  .  . .") & 317-21.

The S-4 further explained that each ESBA investor had the opportunity to avoid

the buyout by changing his or her vote to "yes" after initially voting "no" or abstaining:

> Prior to an agent purchasing the participation interests of non-consenting
> participants for the benefit of the applicable subject LLC, the agent will
> give such participants not less than ten days' notice after the required su-
> permajority consent is received by the applicable participating group in
> such subject LLC to permit them to consent to the consolidation or the
> third-party portfolio proposal, as applicable, in which case their participa-
> tion interests will not be purchased.

Id. at 10; see also id. at 16-20 & 317-21; T. 2647 ("If you don't agree and the super majority is

reached, you have to change your vote or be bought out so that the vote can be changed on behalf

of [ESBA].") , 5618 & 5716-17; In re Empire State Realty Trust, Inc. Investor Lit., 2013 N.Y.

Misc. LEXIS 5990, at *4 (Sup. Ct. Apr. 30, 2013) ("The current transaction documents contain a

provision designed to allow dissenters to avoid selling at the current Buy Out Provision price of

$100.  If 80% or more of the Participants consent to the transaction, it will proceed and dissent-

ers and abstainers will have ten days after getting written notice thereof to change their votes to

'yes' and thereby gain the same benefits as the members of the supermajority."); id. at *15 n.1

("Under the terms of the REIT transaction, each dissenting Participant will have the opportunity

to change an initial 'no' vote or abstention to a 'yes' vote and thereby to obtain the same benefits

as the Participants who voted in favor of the transaction.").

        The S-4 explained the purpose of the buyout, which was included in every ESBA

consent solicitation:

> These buyouts are contractual provisions expressly stated for  .   .   .
> [ESBA] at the inception of the[] subject LLC[] in [its] original participat-
> ing agreement[] dated .  .  July 11, 1961  .  .  .  under which the partic-
> ipation interests were issued.  The buyout provisions were included as a
> practical way to permit the entity to act, while still following the then cur-
> rent tax advice provided to the supervisor of the subject LLCs that partici-
> pants needed to act unanimously to permit these subject LLCs to obtain
> partnership status and to avoid entity level tax as a corporation for U.S.
> federal income tax purposes.  .   .   .  [T]he buyout provisions preserved
> the unanimity which was considered necessary for these tax reasons, but
> prevented a small minority, which might be acting for its own purposes
> and not in the interests of other participants, from preventing action by the
> large supermajority.  The agents are authorized under the participating
> agreement[] to buy out participation interests of participants that do not
> consent to the action if the required supermajority consent is received, as
> described below.  Since such buyout is necessary to provide for the re-
> quired unanimous consent and is not conditioned on the transaction clos-
> ing, the agent has the right to buy out participation interests from partici-
> pants who do not vote "FOR" either proposal, if the required supermajori-
> ty consent is received by the applicable participating group with respect to
> such proposal, within ten days after written notice, as described below,
> whether or not either or neither proposal is consummated.

R-231 at 317-18; T. 2646 & 3734; see also R-43 at 2 ("The buyout provisions were provided for

in the organizational documents based on tax advice received over 60 years ago by the predeces-

sor to Malkin Holdings LLC  .   .   .  at the time the entities were originally formed as required to

avoid 'double taxation' as a corporation under U.S. federal income tax law that no longer ap-

plies."); T. 2637 ("[T]his does talk specifically to the method of operation dealing with the issue

that unanimity was required for the acts on which ESBA could vote and to avoid the tyranny of

the minority thwarting the overwhelming desires of the investors.  It was designed, as it was in

Case No. 01-14-0001-6896

all of these two-tier transactions, to have a super majority which on[c]e[] reached would allow the agents to [e]ffect the will of the vast majority by buying out anybody who did not change her or his vote to be in favor of what for which the super majority had voted."), 2648-49 ("And the fact is that in order to operate under the partner[ship] laws at the time, you needed unanimity.") & 7433.

The Supervisor did not instruct vote solicitors to use the buyout provision to encourage investors to vote yes.   T. 2426, 5617, 5624, 5712 & 7841; see also T. 160 ("There wasn't pressure either way other than the messages that there was going to be a squeeze-out once a super majority was hit.").

Plus, the Supervisor did not want to exercise the buyout provision.  T. 4111 ("In all of our dealings we sought to avoid buying out investors") & 5717 ("I was always sure to emphasize that we do not want to buy you out.  The objective isn't for [ESBA] to buy these interests.  The objective is just to follow the guidelines of the organizing documents, including the buyout provision.").

There is no evidence the Supervisor exercised the buyout provision in this REIT IPO transaction.  See R-43 at 2 ("No participant was bought out in connection with the solicitation of consents from the private entities and over the course of the decades long history of all of these investments, no more than a handful out of thousands of investors has ever been bought out."); T. 3743, 4111-12 & 6771-72.  The Supervisor even accommodated Participants who were concerned they would not be able to change their initial "no" vote to a "yes" vote and thereby avoid the buyout.  T. 5626 & 7473-74.

We conclude Claimants did not establish that the buyout provisions were improper or coercive.   We also conclude Claimants did not prove they were coerced with repeated

Case No. 01-14-0001-6896

threats that the sponsor would take their investment for a mere $100 if they refused to consent to the REIT IPO transaction.[24]

        To the contrary, we conclude the Supervisor was exercising "a fully disclosed and formerly agreed to contract provision" that was "included as a practical way to permit the entity to act, while still following the then current tax advice provided to the supervisor of the subject LLCs that participants needed to act unanimously to permit these subject LLCs to obtain partnership status and to avoid entity level tax as a corporation for U.S. federal income tax purposes." R-231 at 317-18; cf. Koppel v. 4987 Corp., 1997 U.S. Dist. LEXIS 19487, at *10-11 (S.D.N.Y. Dec. 8, 1997) ("Plaintiffs also allege that defendant coerced Participants into acquiescing to the Solicitation by threatening that, if 90% of the Participants in each trustee's partnership share voted in favor of the Solicitation's suggestions, that trustee would purchase the interests of the non-consenting Participants for $100 for each original $10,000 participation.   .   .   .   Koppel and Greenberg each signed a contract expressly providing for the buy-out option to which they now object.  Paragraph 4 of the original participation contract authorized plaintiffs' agent, in the event of a sale of the Building approved by 90% of the Participants in each group, to buy back the interest of any non-consenting Participant in his respective group for book value, but not less than $100.  In this instance, exercising a fully disclosed and formerly agreed to contract provision does not constitute a securities violation."), aff'd in part, rev'd in part, 167 F.3d 125, 133 (2d Cir. 1999) ("The District Court did properly dismiss Koppel and Greenberg's claims under Rule 14a-

---

[24]     For some Claimants, the buyout provision and its threat of confiscation caused great distress, nervousness, and apprehension; they feared they might lose the opportunity to change their vote and "accidentally default."  T. 211, 333-34, 482, 534, 551, 657, 958, 977, 1192-93, 2244, 3034-35, 4694-95, 4700-02, 4705, 5627, 5725-27, 5729, 7755, 7768, 7782-83 & 8170-71.

     We do not discount this anxiety, which may well have caused real terror.  However, this distress alone does not mean that Respondents thereby breached fiduciary duties or did anything improper or fraudulent in connection with the buyout provision, which served the salutary purposes set forth in the S-4.  See R-231 at 317-18.

Case No. 01-14-0001-6896

9 as they relate to many of the other alleged misstatements and omissions described in the com-

plaints.  These claims include allegations that   .   .   .   the Participation Agreement's buyback

provision was unreasonably coercive.  Concluding that these allegations constitute no more than

state law breach of fiduciary duty claims under a thin coat of federal paint, we affirm the District

Court's dismissal of the claims relating to them.").

        In reaching our conclusions, we agree with the court that considered the class ac-

tion challenge to this REIT IPO transaction.  The court dismissed the claim that the buyout pro-

vision in this very solicitation was improper or coercive:

> [T]he absence of a right of appraisal does not mean that Participants are
> being subject to oppressive buy out terms.  Under the terms of the REIT
> transaction, each dissenting Participant will have the opportunity to
> change an initial "no" vote or abstention to a "yes" vote and thereby to ob-
> tain the same benefits as the Participants who voted in favor of the trans-
> action.

R-107 at 7 n.1 (In re Empire State Realty Trust, Inc. Investor Lit., No. 650607/2012, slip op. at 7

n.1 (Sup. Ct. Apr. 30, 2013)).

        We also agree with the court in Schneider v. Malkin, Index No. 605716/1 (Sup.

Ct. Feb. 14, 2002), which rejected a similar claim regarding the Supervisor's buyout provision in

connection with a September 2001 consent solicitation to purchase the fee title of the ESB:

> As to the claim that the vote was coercive, the "buy-out" provision was
> only applicable after 80% approval by the Participants.  In fact, plaintiff
> voted in favor of the Solicitation prior to the 10 day notice of the right to
> purchase unless consent was given.  The purpose of the "buy-out" is to aid
> in the implementation of the decisions of the overwhelming majority of
> the Participants and has been found not [to] be actionable.

Id. at slip op. at 4 (citing Koppel v. 4987 Corp., 1997 U.S. Dist. LEXIS 19487 (S.D.N.Y. Dec. 8,

1997) aff'd in part, rev'd in part, 167 F.3d 125, 133 (2d Cir. 1999)).[25]

---

[25]    Our May 19, 2016 order denied Respondents' motion to dismiss Claimants' claims relat-
ing to the buyout because we concluded the claims were legally sufficient, but only after (a) giving a lib-

Case No. 01-14-0001-6896

For these reasons, we conclude that Respondents did not breach contractual or fiduciary duties and obligations or commit securities or common law fraud in connection with the "buy-out" provisions in the Participation Agreements.

**L.     The Claims Relating to Respondents' Alleged Failure to Reimburse All Transaction Costs.**

The S-4 stated, "if the REIT were approved the Participants and Legacy Investors would be reimbursed for the consolidation expenses previously paid by it out of the proceeds from the IPO and the amount reimbursed will be distributed to participants." R-231 at 9.[26]

---

eral construction to Claimant's claims; (b) providing Claimants with the benefit of every possible inference; and (c) not considering any transaction documents, including the S-4.

Having given Claimants a full opportunity to present evidence in support of their buyout claims and having considered the testimony and documentary evidence presented in the 39-day hearing, we conclude Claimants did not carry their burden of proving their claims relating to the buy-out provisions.

[26]     The "question and answer" in the S-4:

Q: Who will pay transaction expenses relating to the consolidation and the IPO if the consolidation closes and the IPO is consummated, and who will pay the transaction costs relating to the consolidation and the IPO if the consolidation does not close?

A: If the company acquires the property of your subject LLC in the consolidation and the IPO is consummated, the company will bear all consolidation and IPO expenses.  Your subject LLC will be reimbursed for the consolidation expenses previously paid by it out of the proceeds from the IPO and the amount reimbursed will be distributed to participants in your subject LLC.  Each of [ESBA], 60 East 42nd St. Associates L.L.C. and 250 West 57th St. Associates L.L.C.'s allocable share of the costs of the consolidation and IPO as of September 30, 2012 are $16,024,725, $4,286,205, and $2,232,502, respectively.  The supervisor estimates that the aggregate costs of the consolidation and IPO will be approximately $75,000,000 and that each of [ESBA], 60 East 42nd St. Associates L.L.C. and 250 West 57th St. Associates L.L.C.'s allocable share of such aggregate costs will be approximately $18,600,000, $4,900,000 and $2,600,000, respectively.  If the consolidation does not close or your subject LLC does not approve the consolidation, your subject LLC will bear its proportionate share of the consolidation and IPO expenses based on exchange values and will not be reimbursed for the consolidation and IPO expenses previously paid by it.

R-231 at 9-10; see also T. 3993-94.

Case No. 01-14-0001-6896

Claimants claim this statement was materially false:

> After completion of the IPO, Respondents made reimbursements to the consolidated properties in the REIT, which in turn distributed the reimbursed funds to the Participants and Legacy Investors.  The amounts reimbursed, however, were substantially less than the actual consolidation and IPO expenses.  More significantly, the Respondents immediately, upon completion of the IPO, re-imposed the full complement of transaction expenses on the Participants and Legacy Investors without disclosure to the Participants and Legacy Investors, and in direct violation of Respondents' prior statements to the contrary.

CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 80.

This claimed fraud allegedly caused substantial damages:

> In the Malkins' notification to the Participants and Legacy Investors of their computation of share allocation in the REIT, the Malkins fraudulently omitted two material facts, that the market value of the REIT was $3.126 billion, and that they had reduced that amount by $234 million in consolidation and IPO expenses.  The Participants and Legacy Investors thus paid the transaction costs twice: first, by the reduction of their distributions from earnings; and second, by the direct and immediate reduction of their equity in the new entity.  As a direct result of Respondents' fraudulent transfer of the REIT expenses, ESBA's exchange value percentage of 28.23% was applied to the reduced capitalization of $2.892 billion, thereby allocating to the Participants 28.23% of the planning costs, taxes, and underwriting fees, or $66 million in transaction costs.  The Legacy Investors suffered a proportionate diminution in the value of their ESRT shares for consolidation and IPO costs which were allocated to them by Respondents both fraudulently and in gross violation of their fiduciary duties

Id. at ¶ 82.

Contrary to Claimants' allegations, the investors were reimbursed for all transaction costs that ESBA incurred in the transaction.  T. 5471.  Each investor received a *pro rata* check to reimburse his or her share of the transaction costs – the monies came out of the REIT IPO proceeds.  C-77 at G&A-6986-009820 ("This letter and enclosed check explain to you [ESBA's] final cash distribution.  .  .  .  The total distribution to be made is $40,270,992, which is comprised of:  .  .  .  $24,923,377 of reimbursement for consolidation and IPO costs

78

previously paid by ESBA]."); T. 936-37, 3993-95 & 5472-75 (the original ESBA investors received slightly less from their ESRT stock ownership because ESRT funds were used to fund the expense reimbursements).

Relying on the "reimbursed for the consolidation expenses" reference in the S-4, R-231 at 9, however, Claimants contend they did not receive reimbursement for *all* transaction expenses. CONFORMED STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION ¶ 80 ("The amounts reimbursed, however, were substantially less than the actual consolidation and IPO expenses."). Claimants assert they were not reimbursed for the following transaction expenses:

| Description of alleged unreimbursed expense | Amount |
|---|---|
| Project planning costs | $110,000,000 |
| Transfer taxes | $89,513,000 |
| Underwriting fees | $20,803,888 |
| Other REIT expenses | $13,942,500 |

C-193 at G&A-6986-010059; REVISED C-168 at G&A-6986-021725.

Claimants' claim is without merit. They were reimbursed for the project planning costs. T. 5273-76 & 5471-72. And they are not entitled to recover the other expenses. This portion of their reimbursement claim rests on a misreading of the S-4. See REVISED C-168 at 5; T. 5268-69. The S-4 did not promise that the investors would be reimbursed for *all* transaction expenses. Rather, it stated, "Your subject LLC will be reimbursed for the consolidation expenses previously paid *by it* out of the proceeds from the IPO." R-231 at 9 (emphasis added).[27]

––––––––––––––––––––

[27]    Relying on this provision from the S-4 and opining that Respondents failed to reimburse all consolidation expenses, Claimants' expert inexplicably had the following incomplete quotation in his report – omitting the above two italicized words and thereby materially modifying the reimbursement provision: "'Your subject LLC will be reimbursed for the consolidation expenses previously paid .   .   . out of the proceeds from the IPO and the amount reimbursed will be distributed to participants in your subject LLC.'" REVISED C-168 at 5 (quoting R-231 at 9) (ellipsis in expert report, *but not in original*); T. 5266-69. Claimants' expert was not able satisfactorily to explain the omission of these two words. T. 5269 ("At this point I have no recollection as to why it was left out.").

Case No. 01-14-0001-6896

The "subject LLC" – ESBA – did not pay transfer taxes, underwriting fees or "other REIT expenses" before the closing of the REIT IPO; the newly formed entity – ESRT – paid these expenses.  C-84 (value of "restricted shares" issued in the transaction: $13,942,500); T. 2548 ("[T]he reimbursement pledge was to deal with costs that had come out of pocket up to the point of the transaction actually being – the transactions being consummated, so those would be the amounts that were paid by the entities prior to the conclusion of the deal.  That's at least my recollection."), 2549 ("the intention was and the listing was for those things which came out of pocket prior to the IPO itself"), id. (the reimbursement provision did not include underwriting fees), 2549-50 (the reimbursement provision did not include transfer taxes), 3994 ("Q. And what does the phrase 'previously paid out' there mean to you?  A. Everything up to the closing of the IPO I would say."), 5266 ("other REIT expenses" referenced in Claimants' damage claim is the same as the "restricted" REIT shares issued in connection with the transaction) & 5272-73 (ESBA did not "previously" pay out ESRT restricted shares).  Cf. T. 5271 (Claimants' expert did not know if ESBA paid the transfer taxes or the underwriting fees).  Even Claimants' witness Martin Flaxman agreed the investors got what they were promised when it came to reimbursement of transaction expenses.  T. 932.

Claimants further contend Respondents improperly applied and retained a six percent override on the expense-reimbursement distributions to the Participants.  C-193 at G&A-6986-010059 ("Wrongful Deduction of 6% override – $1,495,402"); see also T. 3995.  Cf. T. 5293 (Claimants' expert's report does not consider alleged "wrongful deduction of the six percent override").   But the agreed-upon six percent override applied to the expense-reimbursement distributions because they were "cash distributions" to the Participants:

> The only way [ESBA] gets the money to pay the bills or to make distributions aside from the basic rent is overage rent.

And the recipient of the override is not ESBC, it's the Malkin Holdings or Malkin group whoever actually owns the override.

So the overrides are, as we've gone into before, there are overrides which were applicable to interest in ESBC, there are overrides which were applicable to ESBA.

The 6 percent override on ESBA is on overage rent.  The overage rent goes to ESBA and that override is then paid to the owner of that override.

.  .  .  .

Malkin Holdings had a 6 percent override on overage rent on the reimbursement to [ESBA] of amounts that had been paid out by [ESBA], that not only – those amounts which had been paid out had not only reduced the distributions to the participants, but it had also reduced the override to Malkin Holdings.  When the money was reimbursed, Malkin Holdings was entitled to an override on that overage rent before it was distributed to the participants.

.  .  .  .

THE CHAIRMAN: This was money to which an override had never before been applied.

THE WITNESS: Correct.

THE CHAIRMAN: And so therefore your position is unless an override is supplied, this would be kind of override free money that doesn't deserved to be override free money.

THE WITNESS: Correct.

T. 2567-69; see also T. 3996 ("[T]his was effectively an additional distribution.  These were the foregone distributions and under the organizational documents, there is a distribution payable to the supervisor equal to six percent of additional distributions.  .  .  .  If they weren't paid as expenses for the IPO consolidation, they would have been distributed at that time.").

Case No. 01-14-0001-6896

For these reasons, we conclude that Respondents did not breach contractual or fiduciary duties and obligations or commit securities or common law fraud in connection with the purported failure to reimburse all transaction expenses.

### M.     Respondents' Remaining Defamation Counterclaim.

#### (1)     The Alleged Defamatory Statements.

Respondents allege Claimant Edelman Family Decedent's Trust (the "Edelman Trust") is liable for the alleged defamatory statements that Richard Edelman purportedly made on an October 17, 2013 telephone conference call, including the following:

- Malkin Holdings "put false information in SEC filings" and "admitted in SEC filings that they provided false SEC filings.  The SEC filings said if there was no REIT, ESBA would not be able to pay the mortgage.  They admitted that was false when they had 99% of the vote."  RESPONDENTS' PRE-HEARING SUBMISSION at 5; ANSWERING STATEMENT AND COUNTER-CLAIMS OF RESPONDENTS ¶ 80.

- Richard Edelman personally had a "tremendous discussion" with the SEC "about the jeopardy the Malkins are putting the REIT in."  Id.

- The Malkins are "thugs" and "they think that they can say things that aren't true but the rewards are so great that they will say it anyway."  Id.

- Malkin Holdings "had a plan, to deny [Participants] information."  Id.

Respondents further allege the Edelman Trust is liable for the alleged defamatory statements that Richard Edelman purportedly made in a November 7, 2013 telephone conference call with ESBA investors, including the following:

- "There is new information from the SEC about communications between Malkin Holdings and the SEC during the process.  It's clear from what I've read that Malkin Holdings did violate securities laws.  They admitted it."  R-148 at 1; ANSWERING STATEMENT AND COUNTERCLAIMS OF RE-SPONDENTS ¶ 81; RESPONDENTS' PRE-HEARING SUBMISSION at 5.

- "They did lie to their investors in an SEC filing that was mailed to inves-tors where they said we used our overage or additional rent to pay the mortgage on the purchase of the fee title.  They then said later in that letter

Case No. 01-14-0001-6896

that if we did not approve the REIT we maybe would receive our addi-tional rent or overage rent in the future.  And they were forced by the SEC to correct that and admit, in fact, that we did not use that money to pay the mortgage on the fee titles.  And we used our basic rent, which is guaran-teed money.  And this was the subject of my meeting with the FBI.  It was mailed across state lines and it's therefore a federal offense, and that's why I got them involved."  R-148 at 3; ANSWERING STATEMENT AND COUNTERCLAIMS OF RESPONDENTS ¶ 81; RESPONDENTS' PRE-HEARING SUBMISSION at 6.

- "Malkin Holdings has admitted that they violated SEC regulations.  SEC repeatedly warned them that they could never defend themselves by say-ing the SEC approved the S-4 and S-11.  Every time Malkin Holdings said they made an error, they mailed letters from investors who were support-ive of the transaction and the investors in some cases made fairly outra-geous or simplistic claims.  Those claims are considered as having been issued by Malkin Holdings because they mailed them.  And those claims violate SEC regulations.  And Malkins' attorneys were forced to admit that they did violate SEC regulations and that in fact they knew that they would be considered as being issued by Malkin Holdings.  Everyone should know the issues that the SEC asked Malkin Holdings about, we have not seen the answers to the questions, but these guys went 'rogue' some time ago.  More to come on how Malkin Holdings answered the SEC."  R-148 at 4; ANSWERING STATEMENT AND COUNTERCLAIMS OF RE-SPONDENTS ¶ 81; RESPONDENTS' PRE-HEARING SUBMISSION at 6.

- "Anyone who read documents would know [the REIT IPO transaction] was a bad transaction.  SEC asked Malkin Holdings to prepare abridged documents, and it is in that material where they lied.  And I don't use that term casually.  And of course we all know that Peter Malkin lied when he called investors.  You've heard people on the calls talking about those calls, and the SEC had a team of three lawyers who interviewed them.  I don't know if they interviewed 30 or 50 of them.  I know that a large number called up the SEC and related their conversation in particular with Mr. Malkin when he was making very 'tall stories,' some of which were almost humorous where he related conversations that he had with me. I've never spoken to the man.  He told people that I changed my mind and I voted for the REIT.  It's a bizarre story, they were like a totalitarian re-gime.  Malkin Holdings did anything they want and they paid tens of mil-lions to lawyers.  They will find that when we tell our story people will be so offended that their victory will be Pyrrhic.  They started to violate rules and laws that govern these things."  R-148 at 5; ANSWERING STATEMENT AND COUNTERCLAIMS OF RESPONDENTS ¶ 81; RESPONDENTS' PRE-HEARING SUBMISSION at 6.

- "We did get the details [of the other purchase offers on ESB].  That's the part that Malkin lied to you about.  Malkin Holdings hid from buyers, lit-

83

erally.  They didn't conduct any auction.  They hid.  They had no commu-
nication with any of the buyers."  R-148 at 6; ANSWERING STATEMENT
AND COUNTERCLAIMS OF RESPONDENTS ¶ 81; RESPONDENTS' PRE-
HEARING SUBMISSION at 6.

- "When management, when Peter Malkin, calls investors and lies to them,
  that's a bizarre situation.  The SEC has interviewed scores of investors
  who have related these stories."  R-148 at 6; ANSWERING STATEMENT AND
  COUNTERCLAIMS OF RESPONDENTS ¶ 81; RESPONDENTS' PRE-HEARING
  SUBMISSION at 7.

- "The Malkins will face some sort of justice about crossed lines that meant
  that they violated laws.  We'll feel that we had a fair hearing."  R-148 at
  11-12; ANSWERING STATEMENT AND COUNTERCLAIMS OF RESPONDENTS ¶
  81; RESPONDENTS' PRE-HEARING SUBMISSION at 7.

- "Section 4 of the Participating Agreement requires consent of all partici-
  pants to renew or modify the master lease.  No vote was taken.  Your
  manager went rogue a long time ago.  The SEC knows."  R-148 at 12;
  ANSWERING STATEMENT AND COUNTERCLAIMS OF RESPONDENTS ¶ 81;
  RESPONDENTS' PRE-HEARING SUBMISSION at 7.

- "They did not have your best interest at heart."  R-148 at 12; ANSWERING
  STATEMENT AND COUNTERCLAIMS OF RESPONDENTS ¶ 81; RESPONDENTS'
  PRE-HEARING SUBMISSION at 7.

- "[The Malkins] are people who should not have been trusted, this all
  shows.  This is a tainted management team."  R-148 at 13; ANSWERING
  STATEMENT AND COUNTERCLAIMS OF RESPONDENTS ¶ 81; RESPONDENTS'
  PRE-HEARING SUBMISSION at 7.

- "I hope the Malkins will explain to those who are writing the books on
  them.  They can explain why they thought it was ok to revise the master
  lease without vote.  In the end they 'took advantage by lying and filing
  false SEC filings.'"  R-148 at 15; ANSWERING STATEMENT AND COUNTER-
  CLAIMS OF RESPONDENTS ¶ 81; RESPONDENTS' PRE-HEARING SUBMISSION
  at 7.

Respondents further claim that, on a June 5, 2014 telephone conference call with

former ESBA Participants, Richard Edelman made additional defamatory statements:

- The Malkins had misinformed them by stating that they "purchased the
  land under the [ESB].  .  .  .  This gets into the thicket of what transpired
  during those years.  They owned it just like you did.  It was a typical
  'Malkin-ess' fudge.  It was a deception; that seems to be the common
  theme when we look at these things.  I'm not surprised that they say that,

84

though I'm disappointed."  ANSWERING STATEMENT AND COUNTERCLAIMS OF RESPONDENTS ¶ 82; RESPONDENTS' PRE-HEARING SUBMISSION at 7.

- The REIT IPO transaction had "diluted" the value of the ESBA participants' units.  ANSWERING STATEMENT AND COUNTERCLAIMS OF RESPONDENTS ¶ 84; RESPONDENTS' PRE-HEARING SUBMISSION at 7.

- "The other investors are riding our coat tails."  Id.

Contending that Richard Edelman made these alleged defamatory statements in his capacity as beneficiary of the Edelman Trust, Respondents assert the Edelman Trust is liable under the doctrine of *respondeat superior* because Richard Edelman's defamatory statements can be imputed to the Edelman Trust under principles of actual agency or apparent agency.  RESPONDENTS' POST-HEARING BRIEF at 97-98; T. 8382 ("we contend that Richard Edelman was acting on behalf of the trust, either with authority or apparent authority, in connection with his activities").

We do not have to consider the Edelman Trust's contentions that (a) Richard Edelman did not make the purported statements; (b) Richard Edelman's purported statements were not defamatory; (c) the statute of limitations bars the defamation counterclaim; and (d) a qualified privilege "protects" Richard Edelman's purported statements.  See EDELMAN FAMILY DECEDENT'S TRUST'S POST-HEARING BRIEF.  Even if we were to find in favor of Respondents on all these issues, we conclude that the Edelman Trust is not liable for Richard Edelman's claimed defamatory statements.

### (1)   Richard Edelman Did Not Have Actual Authority to Make the Alleged Defamatory Statements.

In support of their assertion that Richard Edelman had actual authority to make the alleged defamatory statements, Respondents point to Anthony Malkin's testimony that trustee Howard Edelman "authorized his son [Richard Edelman] to represent his interest and – ."  T.

Case No. 01-14-0001-6896

2472.  However, Respondents did not establish the origin, nature, or scope of this alleged actual agency.

The evidence reveals only that Richard Edelman was listed in a "Designee Master File Maintena[n]ce" document as a "designee."  R-303; T. 8389.  We do not know the nature of the "designation."  Did the designation allow Richard Edelman to communicate with Malkin Holdings regarding the Edelman Trust?  Did the designation allow Richard Edelman to communicate with third parties regarding the Edelman Trust?  If so, under what circumstances?  When Howard Edelman was not available?  At other times?  Was the designation in place so Respondents had someone to contact when they could not reach Howard Edelman?

Further, we do not know the origin or creator of this document, which was "a Malkin Holdings' document," id., and hence not something that Howard Edelman prepared or in any way helped to prepare.  Plus, we do not know the name(s) of the person(s) who provided the information in the document.  This single document, without more, is too slender a reed on which to conclude that the Edelman Trust "designated" Richard Edelman to act and speak for the Edelman Trust in all respects.

Aside from these unanswered questions, there are other gaps in determining whether Richard Edelman had "actual authority."  We do not know if and how Howard Edelman authorized Richard Edelman to represent his interests in the Edelman Trust, including by communicating with others about the investment.  See T. 2472.  We do not know what, if anything, Howard Edelman communicated to Richard Edelman, whether Howard Edelman consented to Richard Edelman's performance of these acts, and whether Howard Edelman conducted himself in a manner that permitted him to exercise control over Richard Edelman.  See In re Parmalat Securities Litig., 594 F. Supp. 444, 451-52 (S.D.N.Y. 2009) ("[Actual authority] may be express

86

or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act.") (citations and quotation marks omitted).

For these reasons, we conclude Richard Edelman did not have actual authority to speak for the Edelman Trust when he purportedly made the alleged defamatory statements. Underscoring our conclusion, Danielle Barger, the current trustee of the Edelman Trust, stated that the trustee of the Edelman Trust did not have any authority to appoint an agent. T. 8371 ("In order for a trust to have authority to appoint an agent like a Power of Attorney under the trust, it has to have a specifically enumerated clause that has that. And this trust does not have such a clause. ¶It would also have to be reflected in an accompanying Power of Attorney document reflecting the trust, but it had no authority to do that because it wasn't in the original trust.") & 8389 ("As I testified earlier, the trust did not allow him to delegate such authority.").

### (2)   Richard Edelman Did Not Have Apparent Authority to Make the Alleged Defamatory Statements.

To prove Richard Edelman had apparent authority in purportedly making the alleged defamatory statements, Respondents must establish that Howard Edelman – the principal – by words or conduct led people with whom Richard Edelman dealt to believe the principal granted the agent authority he purported to exercise. See, e.g., In re Nigeria Charter Flights Contract Litig., 520 F. Supp. 2d 447, 464 (E.D.N.Y. 2007) ("Apparent authority is that authority which the principal holds the agent out as possessing, or which he permits the agent to represent that he possesses  .   .   .  .") (citations and quotation marks omitted).

In support of their apparent agency argument, Respondents assert Richard Edelman acted as if he were a Participant, and not merely a trust beneficiary, because (a) he operated a web site for ESBA investors that stated that it "is a website for fifty year participant investors

Case No. 01-14-0001-6896

in" ESBA, T. 1246 & 2796; R-300; (b) his August 28, 2012 e-mail referred to "we, the owners of

the [ESB]," R-55 at R_000033576; (c) he referred to himself "as fellow participant investors in

[ESBA]," a "fellow investor," and a "fellow participant," id. at R_000033578; T. 1956, 7619 &

7586; (d) other ESBA investors referred to him as an "investor" in ESBA, R-199; T. 582; and (e)

he acted as if he were a principal with respect to the Edelman Trust's underlying investment in

ESBA, see RESPONDENTS' MARCH 6, 2016 MEMORANDUM at 10 ("Richard Edelman and Steven

Edelman acted as if they were the principals with respect to the trust's underlying ESBA invest-

ment.").

      None of this evidence gets Respondents closer to the goal line on their apparent

agency assertion.  There is no evidence that *Howard Edelman* "held out" to others that Richard

Edelman possessed any authority to act or speak for or on behalf of the Edelman Trust.  Nor is

there evidence that *Howard Edelman* in any way permitted Richard Edelman to represent that he

possessed any authority on behalf of the Edelman Trust.  One cannot create apparent authority as

an agent by his or her own actions or representations.

      Plus, nothing in the record shows that Howard Edelman, an elderly man, (a) re-

ceived, saw or knew about Richard Edelman's August 28, 2012 e-mail, see R-55; (b) participated

in or knew about any of Richard Edelman's telephone conference calls with ESBA investors, cf.

T. 660 ("I don't even know who Howard Edelman is."); or (c) knew what Richard Edelman was

doing, communicating or saying "on behalf of" the Edelman Trust.  And there is no evidence that

Howard Edelman, by *his* words or by *his* conduct, did anything whatsoever to lead third parties

reasonably to believe that *he* had granted any authority of any kind to Richard Edelman.  The

bottom line: Respondents do not point to any words or conduct of *Howard Edelman* that would

give rise to the appearance and reasonable belief that Richard Edelman possessed any authority

Case No. 01-14-0001-6896

to act on behalf of the trust.  See In re Nigeria Charter Flights Contract Litig., 520 F. Supp. 2d at 463 ("the third party's reliance on the appearance of authority must have been reasonable").

Respondents contend, however, that Howard Edelman's silence alone is sufficient to create apparent authority because it established his "acquiescence" to Richard Edelman's actions and words.  See In re WorldCom, Inc., No. 02–13533 (AJG), 2007 WL 735021, at *5 (Bankr. S.D.N.Y. Mar. 9, 2007) ("[A] principal's silence is sufficient to create apparent authority."); Hatton v. Quad Realty Corp., 100 App. Div. 609, 610 (2d Dep't 1984).

Respondents assert, for instance, that Howard Edelman "took no steps to correct Richard Edelman's representation that he was a principal, thereby implicitly consenting to it." RESPONDENTS' POST-HEARING BRIEF at 99; see also T. 2478 ("but the reality is that he never came forward and disavowed the actions of his son.") & T. 7158 ("when the information became public and was published in the print, the media, [Howard Edelman] did nothing to contradict it").

Respondents' claim is speculative and conclusory, as they impliedly concede. See RESPONDENTS' POST-HEARING BRIEF at 99-100 ("the only possible conclusion is that Howard Edelman, as trustee, was (or should have been) aware of his son's activities"); T. 7157 ("Howard had to know what he was doing if he authorized it"); T. 7305 ("I say that Howard Edelman negligently, recklessly and/or knowingly permitted the beneficiary of the trust, Richard Edelman, to act on behalf of and in the interest of the Edelman family trust of which Howard was the trustee.").

We do not know the state of Howard Edelman's knowledge or information regarding Richard Edelman's words and conduct.  We do not know whether Howard Edelman was capable of paying attention to and follow the communications that preceded the REIT IPO trans-

Case No. 01-14-0001-6896

action or any of Richard Edelman's communications.  <u>See</u>, <u>e.g.</u>, C-58.  We do not know the state of Howard Edelman's relationship with his son, Richard Edelman.  And nothing in the record suggests Respondents or anyone else ever demanded that Howard Edelman stop Richard Edelman from communicating claimed falsehoods regarding Respondents – or even informed Howard Edelman that Richard Edelman purportedly was communicating falsehoods regarding Respondents.  <u>See</u> T. 7295-96 (Peter Malkin never communicated with Howard Edelman).

Under these circumstances, we are unable to conclude that Howard Edelman could have taken steps, let alone effective steps, to come forward and prevent Richard Edelman from repeatedly misrepresenting that he was a Participant, an ESBA investor and/or a spokesperson for the Edelman Trust.  <u>Cf.</u> T. 2478 (Anthony Malkin) ("he never came forward and disavowed the actions of his son") & 7151 (Peter Malkin) ("the counterclaims are based on statements and actions by the beneficiaries of the trust of which Howard was the trustee and who claim to be acting on his behalf saying that they were the investors, and he didn't contradict that.").

As the following summaries show, Respondents' cited cases in support of their apparent agency contention are easily distinguishable; they reveal how Respondents' apparent agency argument misses the mark:

- <u>Johnson v. Nationwide General Ins. Co.</u>, 162 F.3d 1148 (2d Cir. 1998) (<u>mem.</u>) – The principal not only "widely advertis[ed]" the apparent agent's agency and "provided [the apparent agent] with various indicia of authority"; the principal, after "cloak[ing the apparent agent] with an aura of authority on which [plaintiff] reasonably relied, failed to "terminate [the apparent agent's] apparent authority.  [The principal] did not publicize its termination of [the apparent agent] to his previous customers, much less to those members of the public who, like [plaintiff], would be justified in believing that such agency continue[d] to exist."

- <u>In re Nigeria Charter Flights Contract Litig.</u> – There was a triable issue of fact to support plaintiff's apparent agency claim; the principal knew the

putative agents "actively misrepresented themselves as [plaintiff]" by – among other things – using plaintiff's name, logo and other trademarks in a manner inconsistent with the terms of a trademark license agreement.  In re Nigeria Charter Flights Contract Litig., 520 F. Supp 2d at 464.

- In re WorldCom, Inc. – The principal authorized the agent to accept service of process on behalf of the principal and then withdrew the authorization, but continued to treat the agent as its agent for service of process and failed to inform third parties it had switched registered agents:

  > It is a familiar principle of law that when one has constituted and accredited another his agent to carry on a business, the authority of the agent to bind his principal continues, even after an actual revocation, until notice of the revocation is given.  In the absence of any notice of the revocation of an agency, the principal may be held liable to third persons who never dealt with the agent previous to the revocation, if they, in common with the public at large, are justified in believing that such agency continues to exist.

  > .  .  .  .

  > [The principal] authorized [the apparent agent] as its registered agent, and, as a result, [plaintiff] was aware that [the apparent agent] was the registered agent.  After the Withdrawal [in bankruptcy], the Debtors have not established that they provided adequate notice that [the apparent agent] was no longer their agent.

  In re WorldCom, Inc., 2007 WL 735021, at *4-5 (citation and quotation mark omitted).

- Hatton v. Quad Realty Corp. – The principals knew Kaufman, the apparent agent, for years had accepted payments on their behalf; the principals designated Kaufman for this very purpose.  Hatton v. Quad Realty Corp., 100 App. Div. at 610 ("By acquiescing in the designation of Kaufman as the person to whom the plaintiff was to make the mortgage payments and the tax, etc., payments and by accepting payment from him over a period of years, [the principals] impliedly consented to his agency for this purpose.").

- Murray v. Holnam, Inc., 344 S.C. 129, 139, 542 S.E.2d 743, 748 (2001) – "A principal may be held liable for defamatory statements made by an agent acting within the scope of his employment or within the scope of his apparent authority."

Case No. 01-14-0001-6896

In stark contrast to these cases, there is no evidence that putative principal How-ard Edelman (a) actively held out or "widely advertised" Richard Edelman as an agent; (b) pro-vided Richard Edelman with an aura of authority or with "various indicia of authority"; (c) had actual knowledge of Richard Edelman's alleged misrepresentations; (d) authorized Richard Edelman to act as an agent of the Edelman Trust; or (e) accepted benefits as a result of Richard Edelman's actions "on behalf of" the trust.

In <u>Graham v. Los Angeles First Nat'l Trust & Savings Bank</u>, 3 Cal. 2d 37 (1935), which Respondents also cite, the court did not consider apparent agency issues:

> Since the bank held legal title to the real property which the plaintiffs agreed to purchase, it follows that in the negotiations of purchase and sale relating to the real property, the bank stood in the position of principal and the beneficiary-sellers stood in the position of agents.  It is now settled  .  .  .  that a purchaser who has been induced to enter into a contract by the fraudulent misrepresentations of an agent, by rescinding the contract may recover the consideration paid from [sic] the principal, although the prin-cipal was in fact ignorant of the representations made, and although such principal had attempted to limit its liability by a clause in the contract to the effect that it would only be bound by the representations contained in the written contract.

<u>Id.</u> at 42-43 (citations omitted).

And in <u>King World Productions, Inc. v. Financial News Network, Inc.</u>, 660 F. Supp. 1381 (S.D.N.Y. 1987), which Respondents cite, the court found there was "apparent agen-cy" because the putative principal led people with whom the agent dealt to believe the principal had granted the agent the authority he purported to exercise.  <u>Id.</u> at 1385 ("Given [the agent's] position at [the principal] nationally, his position within the local office, and his key role during the negotiations, there was nothing to put [plaintiff] on notice that [the agent] might not have au-thority to execute the sublease.  .  .  .  [The principal's general counsel] directed that [plaintiff] bring the sublease to [the agent] for execution.  He specifically instructed [plaintiff's] representa-

Case No. 01-14-0001-6896

tive to take the sublease to [the agent's] office, where [the agent] would execute it.").  Here, by contrast, there is no evidence that Howard Edelman led anyone with whom Richard Edelman dealt to believe Howard Edelman had granted Richard Edelman the authority to act on behalf of the Edelman Trust.

For these reasons, we conclude that Richard Edelman did not have apparent authority.

### (3)    Conclusion Regarding the Defamation Counterclaim.

Richard Edelman's defamatory statements cannot be imputed to the Edelman Trust under principles of actual agency or apparent agency.  Accordingly, the Edelman Trust is not liable for any alleged defamatory statements that Richard Edelman purportedly made.

Two last comments warrant mention in connection with the defamation counterclaim.

*First*, Claimants attack the defamation counterclaim as "the legally unsupported fantasy that a trustee is responsible [for] the alleged defamation statement of one of its contingent beneficiaries, as Richard was, at the time of the alleged statements." EDELMAN FAMILY DECEDENT'S TRUST'S POST-HEARING BRIEF at 1.  However, our finding in favor of the Edelman Trust on the defamation counterclaim is based, not on the legal insufficiency of the counterclaim, but because there was not enough evidence to establish Richard Edelman was acting as an "agent" of the Edelman Trust.  We could not have resolved this triable issue of fact before the hearing.  In re Nigeria Charter Flights Contract Litig., 520 F. Supp. 2d at 464 ("the existence of apparent authority is normally a question of fact") (citation omitted).

*Second*, Claimants contend the panel already dismissed the defamation counterclaim against the Edelman Trust.  EDELMAN FAMILY DECEDENT'S TRUST'S POST-HEARING BRIEF

Case No. 01-14-0001-6896

at 2; EDELMAN FAMILY DECEDENT'S TRUST'S POST-HEARING REPLY BRIEF at 1 n.1.  Not so.  Our

March 6, 2016 order expressly dismissed the defamation counterclaim against Richard Edelman

individually; the order did not dismiss the defamation counterclaim against the Edelman Trust.

## III.   CLAIMANTS' DAMAGES.

We calculate Claimants' damages relating to the Overrides based on the reports of

(a) Claimants' expert Jeffrey M. Risius, dated May 9, 2016, as revised on June 1, 2017, C-167 &

C-245; and (b) Respondents' expert Paul Habibi, dated May 9, 2016, R-171.

Both Risius and Habibi value the ESRT shares at $13.00 per share as of the Octo-

ber 2, 2013 closing date of the REIT IPO, R-171 at 5 ¶ 23 ("Price on 10/2/13[:] $13"); C-167 at

9 ¶ 23.  Based on these calculations, the value of the Overrides corresponds to $23,738.00 for

each ESBA Unit as of the October 2, 2013 closing date (1,826 ESRT shares times $13.00 per

ESRT share).  See R-171 at 5 ("Override Payments Owed to Supervisor[:] $23,738").

We calculate damages on the Override claims by multiplying $23,738.00 by the

number of ESBA Units that each remaining Claimant owned at the REIT IPO closing:

| Name | ESBA Units at IPO | Damages |
| --- | --- | --- |
| 2006 Gilbert M. Edelman Inter Vivos Trust (Myrna Joy Edelman, Trustee) | 5 | $118,690.00 |
| Adler Family Trust (Laurence and Shirley Adler, Trustees) | 1 | $23,738.00 |
| Edelman Family Decedent's Trust (Danielle P. Barger, Trustee | 5 | $118,690.00 |
| Violet Shuker Shasha Living Trust (Violet Shasha and Vivienne Pero, Co-Trustees) | 2 | $47,476.00 |
| Empire State Liquidity Fund LLC | 7.8 | $185,156.40 |
| Mary Jane Fales | 7 | $166,166.00 |
| Melvyn H. Halper | 0.25 | $5,934.50 |
| Phyllis J. Halper | 1.563 | $37,102.49 |
| Wendy S. Tamis | 0.5 | $11,869.00 |

94

We add pre-award simple interest to these damage awards, at the rate of nine per-cent *per annum*, in accordance with New York law and as Claimants' expert specified.  CPLR § 5001(a); AAA COMMERCIAL RULE R-47(d)(i) ("The award of the arbitrator(s) may include: i. interest at such rate and from such date as the arbitrator(s) may deem appropriate[.])"); T. 5152 ("and then you calculate prejudgment interest from there"), 5178 ("this is prior to prejudgment interest"), 5180 ("And those are all before prejudgment interest."), 5181 ("I'm just calculating prejudgment interest at a 9 percent simple interest rate"), 5190, 5191, 5201, 5203, 5204, 5208 ("[f]actoring in prejudgment interest"), 5250; C-245 at G&A-6986-022205 ("Pre-judgment sim-ple interest applied to the concluded damage amount is calculated as follows:  .  .  .  9% interest is based on New York Civil Practice Law & Rules Article 5004 which indicates that interest shall be applied at the rate of nine per centum per annum (9%), except where otherwise agreed upon in a contract or provided by statute.").  We award pre-award simple interest from October 2, 2013 to October 2, 2020, which is the due date for Respondents to satisfy this award.

## IV.    <u>CLAIMS FOR RECOVERY OF ATTORNEY'S FEES.</u>

The Participating Agreements do not provide for the award of attorney's fees to a prevailing party or otherwise.  R-3 at ¶ 2 ("Any dispute arising out of or regarding this agreement or The Property shall be determined by arbitration in the City of New York, in accordance with the rules of the American Arbitration Association then in effect, and such decision shall be bind-ing upon all of the parties.").  In their pleadings and submissions, however, the parties sought an award of attorney's fees and related expenses incurred in this arbitration proceeding.  According-ly, we have the discretion to award attorney's fees.  AAA COMMERCIAL RULE 47(d)(ii) ("The award of the arbitrator(s) may include  .  .  .  an award of attorneys' fees if all parties have re-quested such an award or it is authorized by law or their arbitration agreement.").

95

Case No. 01-14-0001-6896

We granted Claimants' Overrides claims, but we denied Claimants' other extensive claims and we awarded Claimants a small fraction of the damages they sought. We also denied Respondents' remaining counterclaim after we had dismissed, or Respondents had withdrawn, their other counterclaims. Under these circumstances, in our discretion, we decline to award attorney's fees to any party.

## V.   AAA ADMINISTRATIVE FEES AND ARBITRATOR COMPENSATION AND EXPENSES.

The Participating Agreements, dated as of January 1, 1962, do not provide for the allocation of AAA administrative fees or arbitrator compensation and expenses. See R-3 at ¶ 2. However, the parties have requested an award of costs and expenses, specifically AAA administrative fees and Arbitrator compensation and expenses. Because substantial portions of Claimants' claims and Respondents' counterclaims have been withdrawn or denied, the reallocation of costs and expenses is not appropriate. Accordingly, the administrative fees and expenses of the AAA totaling $111,305.70 are to be borne as incurred. The compensation and related expenses of the Arbitrators totaling $909,144.51 also are to be borne as incurred.

## VI.   FINAL AWARD.

For the reasons set forth above, we **DENY** all of Claimants' claims, except for their Override claims. We **AWARD** damages on the Override claims to Claimants, respectively, as follows, and we direct that Respondents jointly and severally pay the following amounts to the following Claimants on or before October 2, 2020:

| Name of Claimant | Principal Amount | Simple Interest at the rate of 9% *per annum*, from October 2, 2013 to October 2, 2020 | Total Award Amount to be Paid on or Before October 2, 2020 |
|---|---|---|---|
| 2006 Gilbert M. Edelman Inter Vivos Trust (Myrna | $118,690.00 | $74,774.70 | $193,464.70 |

96

| Name of Claimant | Principal Amount | Simple Interest at the rate of 9% *per annum*, from October 2, 2013 to October 2, 2020 | Total Award Amount to be Paid on or Before October 2, 2020 |
|---|---|---|---|
| Joy Edelman, Trustee) | | | |
| Adler Family Trust (Laurence and Shirley Adler, Trustees) | $23,738.00 | $14,954.94 | $38,692.94 |
| Edelman Family Decedent's Trust (Danielle P. Barger, Trustee) | $118,690.00 | $74,774.70 | $193,464.70 |
| Violet Shuker Shasha Living Trust (Violet Shasha and Vivienne Pero, Co-Trustees) | $47,476.00 | $29,909.88 | $77,385.88 |
| Empire State Liquidity Fund LLC | $185,156.40 | $116,648.53 | $301,804.93 |
| Mary Jane Fales | $166,166.00 | $104,684.58 | $270,850.58 |
| Melvyn H. Halper | $5,934.50 | $3,738.74 | $9,673.24 |
| Phyllis J. Halper | $37,102.49 | $23,374.57 | $60,477.06 |
| Wendy S. Tamis | $11,869.00 | $7,477.47 | $19,346.47 |

We **DENY** Respondents' remaining Counterclaim.

We did not address all the parties' contentions in this Final Award, including numerous allegations in Claimants' Specification of Material Misstatements and Material Omissions,[28] because we did not consider the unaddressed contentions sufficiently material to this award to warrant discussion.

---

[28]     Claimants' Specification of Material Misstatements and Material Omissions identify Respondents' alleged material misstatements, misrepresentations, and omissions relating to the following:

- The planning and preliminary steps leading up to the REIT IPO.

- The solicitation documents.

- Communications with Participants relating to the REIT IPO.

- Voluntary overrides.

Case No. 01-14-0001-6896

This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby denied.

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

Dated: August 26 2020

_____
CHARLES F. FORER, Arbitrator Chairperson

Dated: August __, 2020

_____
BENNETT PICKER, Arbitrator

Dated: August 24 2020

_____
DAVID C. SINGER, Arbitrator

I, CHARLES F. FORER, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Final Award.

Dated: August 26, 2020

_____
CHARLES F. FORER, Arbitrator Chairperson

I, BENNETT PICKER, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Final Award.

Dated: August __, 2020

_____
BENNETT PICKER, Arbitrator

I, DAVID C. SINGER, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Final Award.

Dated: August 24 2020

_____
DAVID C. SINGER, Arbitrator

We specifically addressed some of these alleged material misstatements and omissions above. See, e.g., CLAIMANTS' SPECIFICATION OF MATERIAL MISSTATEMENTS AND MATERIAL OMISSIONS ¶¶ 26 (reference in S-4 to allocation of the value of ESB between ESBA and ESBC), 41 (reference in S-4 to instructions to Duff & Phelps regarding a joint venture valuation to allocate value of ESB between ESBA and ESBC) 63 (Respondents' alleged misappropriation of the ESB trademark) & 75 (indications of interest to purchase ESBA). We conclude that the remaining alleged material misstatements and omissions are not actionable.

98

Case No. 01-14-0001-6896

This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby denied.

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

Dated: August __, 2020

CHARLES F. FORER, Arbitrator Chairperson

Dated: August 2, 2020

BENNETT PICKER, Arbitrator

Dated: August 2, 2020

DAVID C. SINGER, Arbitrator

I, CHARLES F. FORER, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Final Award.

Dated: August __, 2020

CHARLES F. FORER, Arbitrator Chairperson

I, BENNETT PICKER, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Final Award.

Dated: August 3, 2020

BENNETT PICKER, Arbitrator

I, DAVID C. SINGER, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Final Award.

Dated: August 24 2020

DAVID C. SINGER, Arbitrator

---

We specifically addressed some of these alleged material misstatements and omissions above. *See, e.g.,* CLAIMANTS' SPECIFICATION OF MATERIAL MISSTATEMENTS AND MATERIAL OMISSIONS ¶¶ 26 (reference in S-4 to allocation of the value of ESB between ESBA and ESBC), 41 (reference in S-4 to instructions to Duff & Phelps regarding a joint venture valuation to allocate value of ESB between ESBA and ESBC) 63 (Respondents' alleged misappropriation of the ESB trademark) & 75 (indications of interest to purchase ESBA). We conclude that the remaining alleged material misstatements and omissions are not actionable.

98

Case No. 01-14-0001-6896